## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARC SAVAGE and**<br>**RANDOLPH BLAKE** | |
| **Plaintiff,** | **Civil Action No.: 3:18-cv-30164** |
| **v.** | **JURY TRIAL DEMANDED** |
| **THE CITY OF SPRINGFIELD and**<br>**SPRINGFIELD FIRE DEPARTMENT**.<br>**Defendants.** | |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Marc Savage and Randolph Blake, by and through their undersigned counsel, file this lawsuit against Defendants City of Springfield, and the Springfield Fire Department alleging various violations of their civil rights pursuant to 42 U.S.C. §§ 1981, 1983 and 1988 and the First and Fourteenth Amendment of the United States Constitution,  Title VII of the Civil Rights Act of 1964,  M.G. L. c, 151 B, and M.G. L. 31, §1.

### I. INTRODUCTION

Captain Marc Savage and Lieutenant Randolph Blake are African-American firefighters employed by the Springfield Fire Department and the City of Springfield ("Defendants"). Plaintiffs brings this action on behalf of themselves and similarly situated minority firefighters who have been harmed by Springfield's long-standing and well-established policy, custom, and

practice of opposing racial equality, enforcing racial subordination, engaging in favoritism

towards white firefighters, and retaliating against persons who protest racial discrimination.

## II.  JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the federal claims asserted in this action under 28 U.S.C. §§1331, 1332, 1337, 1338, 1343(a) (4) 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as defendants reside and conducts business in this District and as a substantial part of the events or omissions giving rise to the claims that occurred in this District.

3. Plaintiffs assert state based claims under the supplemental jurisdiction of this court, pursuant to 28 U.S.C. §1367, to hear and decide claims arising under the laws of the State of Massachusetts.  Jurisdiction is specifically conferred on the Court by 42 U.S.C. §2003-5(g).

4. The Plaintiffs have exhausted their administrative remedies and complied with any statutory prerequisites by filing charges with the Equal Employment Opportunity Commission and the Department of Justice alleging race discrimination, harassment and retaliation on behalf of themselves and similarly situated firefighters.  Plaintiffs have perfected their Right to Sue.

## III.  STATEMENT OF CLAIMS

5. The instant lawsuit is for relief for Defendants' violations of 42 U.S.C. §§ 1981, 1983 and 1988 and the First and Fourteenth Amendment of the United States Constitution, Title VII of the Civil Rights Act of 1964,  M.G. L. c, 151 B, M.G. L. 31, §1 as well as various common law tort claims.

## IV.   PARTIES

6.   Plaintiffs Marc Savage and Randolph Blake (hereinafter "Plaintiffs") are residents of

   Springfield, Hampden County, Massachusetts (within this District).

7.   Plaintiffs are employees of Defendants, City of Springfield and the Springfield Fire

   Department, P.C., (hereinafter "Defendants").

8.   Defendants are governmental entities who conduct business within this State and District,

   and at all times relevant to this lawsuit were managers of employees, such as Plaintiffs.

   As such, Defendants are to subject the jurisdiction of this Court.  Defendants may be

   served process by serving its counsel Edward M. Pikula, City Solicitor for City of

   Springfield 36 Court Street 210 Springfield, MA 01103.

9.   Defendants are employers as defined by above referenced statutes, and are subject to

   federal and Massachusetts anti-discrimination laws.

10. Defendants were provided multiple opportunities to resolve the concerns described herein

   prior to the filing of this lawsuit.

## V.  GENERAL ALLEGATIONS.

11. Marc Savage and Randolph Blake are African-American firefighters employed by the

   Defendants.

12. Plaintiff Captain Marc Savage is a highly decorated African-American Muslim member

   of the Springfield Fire Department (SFD) with 39 years of distinguished service to the

   city. He is one of only three members in the last 40 years to receive the department's

   coveted Medal of Honor. His service has been honored with citations from the

Massachusetts State Senate, House of Representatives and Governor. He has also received multiple Hometown Hero Awards and is highly regarded in the community.

13. Plaintiff Lieutenant Randolph Blake is a 29 year veteran of the Springfield Fire Department who has numerous unit and individual citations for meritorious actions.

14. Joseph Conant is the former Commissioner and Appointing Authority of the Springfield Fire Department,  He has a long history of manipulating the civil service process to support promotions of his favored candidates for various positions.

15.  In 2013, a promotional examination for Deputy Fire Chief in the SFD was scheduled by the Commonwealth's Human Resources Department (HRD), upon the request of the Commissioner Conant.  Prior to the examination date, it was postponed.

16. HRD subsequently re-scheduled the examination for March 22, 2014 (one year later) and opened up the eligibility to District Fire Chiefs and Fire Captains.

17.  On March 6, 2014, Commissioner Conant's Deputy Chief of Administration, Jerold Prendergast emailed Luz Henriquez HRD's Senior Compliance Officer to inquire about whether a sufficient number of persons had signed up for the scheduled examination.   On the same day, Ms. Henriquez informed Deputy Prendergast via email that his request was being forwarded to HRD's Examination Administrator, Karen Ambrose for review.

18. After considering the SFD's question for two full days, Ms. Ambrose responded via email on March 8, 2014, stating that "[t]here were only 2 applicants for the Deputy Chief's exam, however, since it was previously postponed, the exam will move forward." In Ms. Ambrose email response, she also invited SFD to contact her with "any additional questions or concerns."  Ms. Ambrose response reflected careful consideration of SFD's

need to fill a permanent position that had remained vacant for years, as well as a willingness to discuss any concerns SFD had regarding her decision to allow the examination to move forward.

19.  As of at least March 8, 2014, Commissioner Conant was aware that there were only two (2) applicants for the Deputy Chief's examination, and that the examination was still being administered as scheduled. Commissioner Conant was also aware that the only two (2) persons who signed up for the promotional examination were Captain Savage and Glenn Guyer (a White resident of Wilbraham).

20.  Commissioner Conant acknowledged in a conversation with Captain Savage (described in detail below) that he was aware "early on" that HRD had decided to proceed with the examination despite having only two applicants.

21. For approximately two weeks (between March 8, 2014 and the date of the examination on March 22, 2014)  Commissioner Conant could have canceled the examination, but he chose not to raise any objections to it moving forward with only two applicants.

22.  Prior to the administration of the examination, most members of the SFD department, including the Commissioner Conant and Deputy Guyer, were well aware that the Deputy Fire Chief position was subject to a residency requirement, which could only be waived by the Mayor via application to the City of Springfield's Department of Human Resources.

23.  On March 13, 2013, HRD sent notices out to the SFD and examinees indicating that the exam was scheduled to be administered on March 22, 2014.  While only two persons applied to take the Deputy Fire Chief exam (Savage  and Guyer), six other persons

applied to take the District Fire Chief's examination, which was identical to the Deputy

Fire Chief examination and administered on the same day, in the same facility.

24. Accordingly, the rationale that there was some unreasonable administrative burden in

administering the exam for only two applicants does not apply to these circumstances.

25. The examination was administered on March 22, 2014, as authorized by HRD.  At the

time, neither the Commissioner Conant nor any HRD officials raised any objections or

concerns about administering the Deputy Fire Chief's examination to only two

applicants.

26.  On May 29, 2014, HRD posted the scores from the March 22, 2014 to each applicants

email account.  Publication of the scores were greatly anticipated and widely known

throughout the SFD on May 29, 2014.

27. Sometime between the posting of the scores on May 29, 2014, and June 5, 2014, a waiver

of the residency requirement was sought by Deputy Guyer.  The Executive Aid to SFD

Commissioner, Dennis Ledger, informed Captain Savage that Deputy Guyer had sought a

waiver from the City of Springfield's Director of Human Resource, William Mahoney,

who in turn forwarded the request to the Mayor, who summarily denied the request.  At

no time between announcing of the scores and the denial of Deputy Guyer's waiver

request did neither Commissioner Conant or any HRD officials raise any concerns about

the posting of examination scores for only two applicants.

28.  It was widely known and understood amongst the SFD leadership and staff that denial of

the residency waiver request essentially meant that Captain Savage would become the

next permanent Deputy Fire Chief, since he was the only remaining eligible candidate for appointment to the position.

29. The appropriate course of action was so obvious that several SFD leaders and fire fighters in the department began to refer to Captain Savage as "Deputy."  For example on the morning of June 5, 2014 after the waiver denial, Dennis Ledger (Executive Aid to SFD Commissioner), greeted Captain Savage with "How you doing Deputy?"   Captain Savage told Mr. Ledger that he did not share his optimism regarding the selection results because of the customary politics.  Mr. Ledger responded by telling Captain Savage that once the waiver was denied there was no good reason why he would not be selected for the position and that "those are the politics!"

30.  However, once it became clear to Commissioner Conant that his preferred white candidate for the permanent position of Deputy Fire Chief would not be eligible for appointment, he endeavored to keep the white candidate in the position on a provisional basis, and deprived Captain Savage of the permanent position.  He accomplished this result by protesting HRD's decision to administer the examination to only two applicants for the Deputy Fire Chief position, despite his prior support for the white candidate receiving consideration amongst only two applicants.

31. Approximately 97 days after the SFD Commissioner first became aware of HRD's decision to move forward with administering the examination for two applicants, and approximately 97 days after Ms. Ambrose first invited the SFD contact her with "any additional questions or concerns," the SFD Commissioner emailed Ms. Ambrose on June 20, 2014 and pressured her into invalidating the examination results.

32. The pressure tactics included questioning why HRD allowed only two applicants to take the examination on March 22, 2014.  Commissioner Conant's email clearly indicated that he was willing to address his "new" concerns with her superiors if she did not capitulate to his pressure tactics.

33. The pressure applied by Commissioner Conant ultimately had its desired effect.  On June 23, 2014, only three days after the Commissioner Contant's subversive protest email, Ms. Ambrose informed SFD of HRD's decision to cancel the examination results it posted on May 29, 2014, which in effect deprived Captain Savage of the Deputy Fire Chief position.

34. The contradictory nature of the circumstances surrounding SFD's initial support and its subsequent opposition to the examination supports that Commissioner Conant's opposition to Captain Savage's selection was motivated by racial bias.

35.  On or about July 8, 2014, the SFD Commissioner came to Captain Savages station on Carew Street.  Before leaving he asked to speak to with Captain Savage.  He began the conversation by informing Captain Savage that he had received some phone calls from various individuals informing him that Captain Savage was upset regarding the aforementioned behavior.  Captain Savage asked him if he was aware that only two persons were taking the test from the beginning.  At first, he told Captain Savage no. Captain Savage told him that it was hard to believe, given his close relationship with Deputy Guyer, that he never learned that the Deputy and Captain Savage were the only two taking the Deputy Chief examination.  Eventually Commissioner Conant admitted to Captain Savage that he knew.  Captain Savage asked Commissioner Conant  why he

didn't raise the issue earlier instead of waiting until June after the scores were published. Commissioner Conant said maybe he should have said something, added that he had "a lot on his plate and he's not perfect."

36. The concerted adverse actions by Commissioner Conant and the City of Springfield, who endorsed Conant's conduct,  deprived Captain Savage of the permanent Deputy Fire Chief position, despite his clear qualifications and eligibility for the position. Commissioner Conant  was clearly predisposed to promoting the white applicant, as evidenced by his repeated attempts to maximize the white applicant's opportunities to be selected, and subsequent elimination of Captain Savage opportunity to be selected once it became clear that Conant's desired result could not be achieved via the waiver process.

23. Captain Savage's selection as Deputy Fire Chief would have been a tremendous benefit to the SFD, and a historic achievement for the City of Springfield given its well-documented record of failing to hire and promote underrepresented minorities.  The failure to select Captain Savage for the permanent Deputy Fire Chief was a clear indication that SFD does not take seriously its own policies regarding equal employment opportunity.

37. Commissioner Conant's conduct has caused Captain Savage tremendous mental anguish, emotional distress and humiliation, which he has endured since receiving notice of HRD's cancelation of his passing examination score.

38. Captain Savage initially experienced feelings of shock and disbelief at Commissioner Conant's conduct, followed by sadness, physical tension, sleep deprivation and loss of appetite.

39. Commissioner Conant's conduct has also caused Captain Savage and similarly situated minority firefighters considerable anxiety regarding their prospects for receiving fair and unbiased promotion consideration by the SFD.

40. Commissioner Conant's conduct has also destroyed morale amongst African-American and other minority firefighters of the SFD regarding their prospects receiving fair and unbiased promotion consideration by the SFD.

41. On September 24, 2014, at a recorded civil service status conference, Commissioner Conant acknowledged that he was aware "before the examination" that only two applicants applied, and that HRD had decided to proceed with the examination despite having only two applicants. Conant also acknowledged that he neglected to raise any concerns to HRD regarding their decision to proceed with the examination for over three months.

42. Commissioner Conant's admissions are sufficient to support that HRD was pressured into changing course by an appointing authority seeking inconsistent application of civil service rules for his own unethical and discriminatory agenda.

43. On approximately May 29, 2014, Captain Savage was informed by the Massachusetts Human Resources Division that he passed the District Chiefs exam administered by them on March 22, 2014. The eligibility list for this same exam was posted on approximately August 18, 2014.

44. Shortly after Captain Savage filed his Civil Service appeal on July 3, 2014, which included allegations of unlawful discrimination, Captain Savage approached District Chief John Murphy and requested that he be trained on how to use Telestaff as it relates

to calling members back for overtime.  District Chief Murphy informed Captain Savage
that he saw no problem with that, yet he would have to ask District Chief Michael Greco
if it was alright to do so.

45. A few days later, Captain Savage was informed by District Chief Murphy that District
Chief Greco told him that Captain Savage would have to wait until he was a Permanent
Captain for six (6) months before he could be trained. Captain Savage articulated to
District Chief Murphy and District Chief Greco that since he had already passed the exam
the circumstances warranted that he be trained in the event that interviews for District
Chief are scheduled so he would be better prepared to fill the role if he were to be
selected. Captain Savage then asked District Chief Vincent Neffinger for his opinion and
he supported their decision not to provide Captain Savage the requested training.

46.  Captain Savage filed a discrimination complaint with the MCAD on September 5, 2014.

47. Approximately 3 weeks prior to the interviews scheduled on November 5, 2014 for
District Chief, Captain Savage was informed by District Chief Murphy that he would
need to conduct an evaluation of Captain Savage for the upcoming interviews.

48. On or about October 15, 2014, District Chief Murphy sat down with Captain Savage to
review his evaluation of Captain Savage.  Captain Savage not only was shocked by his
unfair rating in the categories listed, he was disturbed by District Chief Murphy's
comment that Captain Savage was not ready to act in the District Chief position due to
the fact that he was not fully trained in the operation of Telestaff.

49. Captain Savage  found it perplexing that due to the very training that he requested to prevent this sort of situation, he was being eliminated from any chance of promotion based upon his lack of training as it relates to Telestaff.

50. Captain Savage respectfully explained to District Chief Murphy that, by putting this language in the evaluation and saying that Captain Savage was not ready to act as a District Chief on a temporary basis, he was essentially undermining Captain Savages' chances for a promotion to District Chief.

51.  On a one to five scale, District Chief Murphy rated Captain Savage a three on 10 of the 14 categories listed in the evaluation sheet.  Captain Savage found this to be strange since approximately 1 year prior he was rated  5's and 4's in the same categories when he was being considered for promotion to Captain.

52.  Captain Savage shared his concerns with District Chief Vincent Neffinger and within a few days District Chief Murphy changed his evaluation twice, but District Chief Murphy maintained his position that Captain Savage was not ready to assume the role of District Chief in any capacity until he had more training.

53. Captain Savage requested that he be evaluated by a different District Chief. A few days later Captain Robert Fancy (a white District Chief Candidate with only 12 years on the job) was placed in the acting District Chief position for the night.  Captain Savage asked him had he been trained, and he told Captain Savage yes.  Captain Savage asked him what training he received and he told Captain Savage that he was trained for a few hours and was told he knew everything else so he was allowed to be Acting District Chief.

54.  Interviews resulted in the promotion of Captain Jaime Erickson and Captain Brian

Pereira to Temporary District Chiefs.  These promotions took effect on November 17,

2014 at 0800 hrs. Also on this date District Chief Murphy was being transferred from

Captain Savage's District Chief to District Chief in another group.

55. On the morning of November 17, 2014 Captain Savage asked District Chief Murphy

(before he left) if he felt Captain Savage was ready to assume the role of District Chief on

an acting basis and he told Captain Savage "No".  At this moment District Chief Greco

walked in the office and joined the conversation. District Chief Murphy told District

Chief Greco and Captain Savage that since he had not had the chance for him and

Captain to respond to fire in the District Chief car and see firsthand how Captain Savage

function as an IC that he wasn't going to approve that Captain Savage was ready to

assume the role of District Chief in any capacity.

56. Captain Savage reminded Murphy that no captain or current District Chief, not even

himself, ever had to meet that requirement to be Acting District Chief.  Captain Savage

articulated to District Chief Greco that this was disparate treatment.

57.  District Chief Greco did tell District Chief Murphy that he should not have these criteria

for Captain Savage in determining his readiness to be Acting District Chief.

58. The department promoted Captain Erickson, a  white candidate with 17 years on job

(compared to Captain Savage's 36 years), to temporary District Chief and he has only

had approximately 5 hours of training, and has never been Acting District Chief prior to

his promotion, and never had to get in "the car" and be evaluated as an Incident

Commander (IC).

13

59. District Chief Murphy is a golfing buddy of Commissioner Conant and close friend of Deputy Guyer.  Deputy Guyer had the final say on the authorization of who acts in the District Chief position.  Deputy Guyer should have recused himself from evaluating who would act in the District Chief position, in light of Captain Savage's prior complaint that Guyer was discriminatorily favored in the Deputy Chief promotions process.

60.  The SFD senior managers should have taken corrective action to modify District Chief Murphy's behavior but they chose to allow it to continue for discriminatory and retaliatory reasons.

61. The promotion standards and criteria applied to white candidates were lower than the standards applied to Captain Savage, with respect to consideration for District Chief and Acting District Chief positions.  The disparate treatment was retaliation for Captain Savage filing discrimination complaints.

62. On April 2, 2016. Commissioner Conant ordered District Chief Michael Hess to discipline Captain Savage by giving him an unwarranted verbal warning for allegedly failing to properly train a recruit.  Chief Hess informed Captain Savage that he agreed that this action lacked merit and was unwarranted.

63. Captain Savage was not afforded the due process that is normally provided before discipline is ordered. No investigation was conducted and he was not provided any opportunity to respond prior to the Commissioner's order of discipline.

64. This action came one day after City Council members called for the enforcement of the residency ordinance by the Springfield Fire Department.  Commissioner Conant was well aware that Captain Savage is a supporter of the City Council's actions to address the

discriminatory enforcement of the residency ordinance, and the timing of the Council's

action and Commissioner's action was not coincidental.

65. This was a clear attempt to fabricate documentation to support a false claim that Captain

Savage is not qualified to be a District or Deputy Chief, and smear his good name and

career after 38 years of distinguished service to the City.  Captain Savage had serious

concerns that the Commissioner would continue to misuse his position and authority to

discredit him.

66. Captain Savage brought charges against a disrespectful subordinate and over two months

had passed and Savage had yet to hear from the Commissioner as it related to the

discipline to be leveled.  It is rather odd that Commissioner Conant was so quick to

discipline Captain Savage on a meritless claim with no due process, but couldn't decide

on the discipline for a white subordinate who clearly disrespected Captain Savage.

67. Captain Savage also brought charges against another subordinate for disobeying a

directive which, after two months of waiting, resulted in no discipline because the

Commissioner deemed the matter to be a mere misunderstanding.  It was fairly obvious

that the Commissioner Conant was attempting to dilute Captain Savage authority and

mischaracterize him as a "problematic" candidate for the positions of District or Deputy

Chief.

68. Commissioner Conant's blatant retaliation against Captain Savage was unlawful, violated

department policy and should not have been tolerated by city officials responsible for

oversight of the department.

69. Captain Savage requested that City of Springfield's Human Resources Department take immediate action to address Commissioner Conant's discriminatory and retaliatory conduct.  The conduct was never addressed.

70. The Springfield Fire Department, with assistance from the City's Law department has pursued a persistent campaign of retaliation against Captain Savage for complaining about discrimination, including denial of training (first week of July 2014), unfair evaluations (October 15, 2014 and November 17, 2014), unwarranted disciplinary action (April 2, 2016), biased investigatory findings of mischaracterized events (August 15, 2017), and investigating non-existent rules and regulations to harass, intimidate, and frustrate (November 01, 2017).

71. In addition to the above described disparate treatment and retaliation, which has contributed to a hostile work environment for Plaintiffs and other similarly situated minority firefighters, Captain Savage has been subjected to offensive anti-Muslim comments.

72. The offensive comments included a statement by a firefighter that if Captain Savage "were made a Deputy that everyone would have to pray five times a day" and referring to Muslims as "towel heads."  Another firefighter accused Captain Savage of being a "fundamentalist Muslim" and who hates women, which is wholly false and defamatory. Those charges against Captain Savage were never sustained. Other firefighters have posted offensive images and messages on SFD social media platforms that demean and promote negative stereotypes of African-Americans and Muslims.

73. A number of the offensive comments and images were posted by Springfield Fire Department supervisors and department personnel during the departments business hours, and in some instance the offensive content was posted by SFD personnel while they were on duty.  For example, on August 24, 2015, Brian Conner posted the an offensive image mischaracterizing "Muslim Family Values" while he was on duty.  The image depicted a muslim father figure shooting is daughter in the head.  Several other demeaning images were posted my SFD members that encouraged violence against African Americans and Muslims,

74. These hateful and offensive images continue to be posted on Springfield Fire Department affiliated social media pages, well over a year after Complainant first alerted Defendants to the seriousness of the problem.  Defendants have failed to take prompt and effective remedial action to address the hostile work environment being fostered by the continued posting of racist and Islamophobic images by its employees.

75.  The Springfield Fire Department work schedule records for 2016 confirms that Conners posted this image while on duty in one of at least two Facebook pages dedicated to SFD personnel. The first page is titled "SFD Active and Retired Members Only", which at the time had 154 members many of who are department supervisors. The second page was titled "SFD Exclusive Members Only," which has 83 members, many of whom are department also supervisors.

76. Most recently a Springfield firefighter anonymously posted message on Facebook  in August of 2018, specifically targeted at Captain Savage and Lieutenant Blake.  The post suggested that because of their vocal opposition to discrimination and their advocating

the enforcement of the residency ordinance, that fellow firefighters should, if the

opportunity presents itself, leave Captain Savage and Lieutenant Blake to die in a fire.

Defendants have refused Plaintiff's request to be placed on non-disciplinary leave with

pay, per Department Policy and Procedure, while an investigation is conducted to

determine which firefighter(s) are advocating the endangerment of Plaintiffs' lives.

77. Under well-established agency principles, any knowledge held by the supervisors in these

SFD Facebook groups will be imputed to their employer. A number of the persons

posting the offensive images were supervisors, including Lieutenant Joseph Santa Maria,

Lieutenant Lewis Gaston, Lieutenant Michael Ireland, and Repair Supervisor Steve

Balboni.

78. The Springfield Fire Department and the City of Springfield have a long and disturbing

history of discriminating against minority firefighters. The department's applicant flow

data demonstrates statistically significant underrepresentation of minority firefighters in

hiring and promotions.

79. Captain Savage was retaliated against for voicing his concerns about harassment and

Defendants' discriminatory refusal to enforce its own residency requirement in its hiring

and promotions.  Captain Savage has filed complaints at the MCAD citing a variety of

discriminatory conduct on the basis of race, religion and protected activity.

80. Captain Savage was also the lead plaintiff in a lawsuit before the Massachusetts Superior

Court seeking enforcement of the residency requirement. Lieutenant Blake was also a

named Plaintiff. In the lawsuit, Plaintiffs alleged that Defendants' failure to enforce the

requirement has disadvantaged them and other minority firefighters in hiring and

promotions.  The Court's finding on February 14, 2017 that the residency requirement is

valid and enforceable generated a great deal of additional hostility among Defendants'

leadership towards Plaintiffs.

81. On June 14, 2017, Captain Savage testified at a hearing before the Massachusetts

Commission Against Discrimination regarding the prevalence of racial and religious

harassment in the department.

82. On August 15, 2017, Captain Savage was subjected to adverse actions as result of the

above referenced protected activity.  On August 15, 2017,  he received a letter stating that

Captain Savage was being suspended, transferred and threatened with termination for

reasons that are demonstrably pretextual.  In his entire career, he had never been cited, or

spoken to, for performance issues or unacceptable behavior, and was not afforded the

opportunity to address the concerns cited in Defendants' suspension notice prior to their

findings. Defendants also failed to follow their own progressive discipline policy.

83. On August 20, 2018, a magistrate judge reviewing the suspension determined that

Defendants (more specifically Guyer) and City's behavior was arbitrary and capricious

and suggested that the suspension of Captain Savage be removed.

84. Specific instances are well documents of Defendants selectively allowing white SFD

Members to illegally retain civil service positions, while denying minority opportunities

for advancement.

85.  For example, Defendants  allowed the promotion of Lt. Michael Kneeland (Notice

2016-27) to Temporary Captain on or about August 29, 2016.  This promotion was done

without following Civil Service procedures, including issuing a Human Resource

invitation letter and interviewing for the position.  Only after the Lieutenant Blake complained that Civil Service procedures was not followed did Respondent SFD attempt to retroactively simulate an interview process six (6) weeks after SFD had already chosen its preferred white candidate Lieutenant Kneeland.  Unlawful bias may be inferred from Defendants failure to follow their own policies or guidelines regarding promotions.

86. Another Temporary Captain position opened in July 2017.  The interview panel consisted of Deputy Guyer and Ms. Erica Floyd. This was not a proper SFD promotional interview panel as department policy (SFD P&P 102.32 Promotion Process) at that time, required the presence of one (1) Deputy, (2) District Chiefs, and the Fire Marshall.  Additionally, drug testing and a written evaluation from applicant's superiors were supposed to be completed for each each candidate.  This was also not done, which further inserted subjectivity in promotion decisions that the procedures were designed to minimize.

87. After Lieutenant Blake complained about the process not being followed, SFD immediately changed its procedures to conform the rules to its haphazard approach to promotions. This instance of Defendants failing to follow their own policies further evidences a discriminatory motive.

88. On another occasion on or about March 8, 2018, the Springfield Fire Department (SFD) held promotional interviews for a position of Captain (SPRO18- 0004).  The interviews did not afford fair treatment of all applicants.  For instance,  SFD's Policy 102.32 (Promotion Process) outlines the interviewing protocol, which includes requesting from each applicant a Promotional Evaluation Form.  The policy clearly states that "[f]or those seeking the position of Captain these forms are sent to the District Chief. "  Defendants

did not comply with this important requirement, which helps to ensure that promotional decisions are based on merit.  Compliance with the evaluation form requirement was ignored because SFD had already preselected its favored white candidate, Lieutenant Kneeland.

89. A drug test was also required in the promotional process for the SPRO18- 0004 Captains promotion, pursuant to Article 49 sec. 4 (Local 648 CBA), which states that those "indicating a willingness to be promoted to a permanent civil service within the bargaining unit shall be tested for the presence of drugs/alcohol, and the test result shall be considered as part of the promotional process" (Local 648 CBA 49.04).  Again, Defendants did not comply with this requirement because SFD had already preselected their favored white candidate.

90. Another example of Defendant's arbitrary enforcement of rules that disadvantaged minority members was Defendant's failure to enforce the City's residency requirement in civil service promotions.  Even after Superior Court Judge Sweeney opined that the City's residency ordinance is valid and enforceable, SFD's appointing authority have refused to enforce the ordinance, which has disproportionately disadvantaged minority applicants in the selection process for chief positions. This directly impacts the Plaintiffs because Defendant's' refusal to enforcement  the ordinance at the highest ranks of the SFD has prevented a substantial number of promotion opportunities from opening up at the Captains rank.  Plaintiffs and other well qualified minority members are being harmed by Defendants bias motivated failure to enforce its own selection requirements.

91. Another example of Defendant's arbitrary enforcement of rules that disadvantaged minority members its SFD's attempt to retroactively exclude district chiefs' from compliance with the City's residency requirement, despite already being admonished by Judge Sweeney in an open court proceeding regarding the illegality of doing so.

92. Another example of Defendant's arbitrary enforcement of policies that disadvantaged minority members are its unfair and biased investigative and disciplinary practices. Respondent SFD, along with City's tacit consent, has routinely applied its investigative policies and procedures in an arbitrary manner that disadvantaged minority members. When minority members are accused of violating policy, SFD's investigations are typically swift, aggressive and overreaching. When white members are accused of violating policy, SFD is often slow to investigate, if it does so at all, and the investigations are often purely cosmetic.

93. Defendants' investigations appear to be primarily concerned with shielding white members from accountability to the department rules. For example, no action was taken against numerous white members found responsible for posting racist and anti-muslim images on a SFD website in 2016-2017. No actions were taken Lieutenant Kneeland for fabricating charges (with the complicit support of Conant, Guyer and Murphy) against Lieutenant Blake and Captain Savage in 2017. No investigation or actions were taken against Deputy Guyer and Lieutenant  Kneeland for bullying and harassment charges submitted by Lieutenant Blake and Captain Savage on August 31, 2017.

94. Several other minority firefighters can attest to Defendants' arbitrary and disingenuous investigative and disciplinary practices.

95. Another recent example of the arbitrary enforcement of rules that disadvantaged minority members was Defendant allowing Acting Director of Training, Captain Robert McCaffrey, to return to a civil service position after serving in a non-civil service position for approximately 4 years.  He was not required to show that he had taken an official leave of absence from civil service or to take a civil service exam for the position.

96. Another similar example of arbitrary enforcement, was Defendants' allowing former Commissioner Conant to return to a civil service position (Deputy Chief) after serving in a non-civil service position for approximately 6 years beginning in 2012.  He was also not required to show that he had taken an official leave of absence from civil service or that he had taken a civil service exam for the position.  Even if Conant had properly taken a leave of absence, the maximum number of years he could have maintain his civil service standing was 5 years.  Respondents decision to place him back into a civil service position after a 6 year absence is a violation of the clear requirements of M.G.L. 31 sec. 37, and constitutes additional evidence of discriminatory animus.

97. Another rather glaring of example of the arbitrary enforcement of rules that disadvantaged minority members, is the SFD's contention that since "Captain Savage was Lt. Blake's supervisor", . . . "Therefore the Commissioner determined the additional updated forms could not be either completely objective or helpful."  The offensive and stereotypical inference that a Black Captain could not possibly offer an objective assessment of a Black Lieutenant that he has closely supervised, is totally inconsistent with the maximum deference white supervisors are routinely granted regarding their assessments of their supervisees.

98.  SFD members at the rank of District Chief and higher were all required to sign

agreement that the would move into the city to comply with the City's residency law.

Defendants' failure to  enforce those contracts such non-residents has harmed Plaintiff

and similarly situated employees as third party beneficiaries to those contracts.


## VI.   CAUSES OF ACTION

### COUNT ONE
### (TITLE VII VIOLATION)

99. Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

100.    Defendant's actions and failure to act constitute a violation of Title VII of the Civil

Rights Act of 1964, as amended ("Title VII").

101.    This suit is being brought within 90 days of the receipt by Plaintiffs' of Right to Sue

letter issued by the EEOC and U.S. Department of Justice.

102.    Defendants have discriminated against Plaintiffs by treating them differently from

and less favorably than similarly situated white employees and subjecting them to race

based harassment, discrimination in discipline, discriminatory hiring and promotion

practices, and other differential treatment on the basis of their race affecting their health,

well being and compensation in violation of Title VII.

103.    Defendants have subjected Plaintiff's to disparate treatment and Defendant's policies,

practices, and/or procedures have had a disparate impact on Plaintiffs with respect to the

terms and conditions of their employment.

104.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless,

and/or conducted in callous disregard of the rights of Plaintiffs entitling them to punitive damages.

105.    By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of the Plaintiffs up until the present, Plaintiff are entitled to the application of the continuing violations doctrine to all violations alleged herein.

106.    As a result of Defendants conduct alleged in this Complaint, the Plaintiffs have suffered harm, including but not limited to: lost wages, lost back pay and front pay, lost benefits, lost interest and attorneys' fees and costs.

107.    Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

108.    As a further result of Defendants' unlawful conduct, suffered inter alia, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Plaintiffs are entitled to recover damages for such injuries from the Defendants under Title VII.

109.    By reason of Defendants' discrimination. Plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

**COUNT II**
(VIOLATION of M.G.L. c. 15IB)

110.     Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

111.    Defendants have engaged in systematic discriminatory mistreatment of Plaintiffs based on their race and protected activity.

112.    By its actions and inactions as described herein. Defendants discriminated against Plaintiffs through, inter alia: (a) disparate treatment: (b) discriminatory application policies, practices and procedures regarding hiring, promotions, discipline, leave, investigations and training,  in violation of M.G.L. c. 151B.

113.    Defendants caused, attempted to cause, contributed to. or caused the continuation of racial discrimination, in violation of the M.G.L. c. 151B.

114.    As a result of Defendants' conduct, the Plaintiffs has suffered harm, including but not limited to: emotional distress, lost wages, lost back pay and front pay, lost benefits, lost interest and attorneys' fees and costs.

## COUNT III
### (VIOLATION of M.G.L. 31 sec. 1(e))

115.    Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

116.     Defendants have failed to assure fair treatment of all applicants and employees in all aspects of personnel administration without regard to race and color,


117.     Defendants have failed assure that all employees are protected against coercion are protected from arbitrary and capricious actions.

118.    Since Defendants are responsible for ensuring that policy and procedures for civil service hiring are being appropriately and consistently applied to SFD members, regardless of race, their failure to consistently apply policies and hold decision makers accountable to merit principles constitutes a violation of Plaintiffs and similarly situated minority firefighters constitutional rights.

## COUNT IV
### (UNLAWFUL RETALIATION)

119.   Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs of this Complaint.

120.   Shortly after Plaintiffs voiced their concerns regarding harassment and discrimination, Defendants retaliated against Plaintiffs by subjecting them to unwarranted adverse actions including but not limited to, racial harassment, withdrawal of management support and unwarranted discipline, unfair evaluations, excessive scrutiny and denied employment opportunities.

121.   Plaintiff were subjected to such adverse actions because of their protected activity.

122.   Defendants retaliatory conduct was calculated to dissuade employees from complaining about discrimination and violations their constitutional rights.

**COUNT V**
**(NEGLIGENT SUPERVISION)**

123.   Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

124.   When Plaintiffs complained to Defendants regarding the discrimination and harassment, Defendants breached their their duties under state and federal employment law to investigate Plaintiffs' complaint and hold its supervisors accountable for remedying the discrimination and harassment.

125.   As a result of Defendants' conduct, the Plaintiffs have suffered harm, including but not limited to: emotional distress, lost wages, lost back pay and front pay, lost benefits, lost interest and attorneys' fees and costs.

**COUNT VI**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

126.     Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs of this Complaint.

127.     Defendants intended to inflict emotional distress on Plaintiff and knew, or should have known, that emotional distress was the likely result of their conduct.

128.     Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community.

129.     Defendants' actions of were the cause of the Plaintiffs' distress

130.     The emotional distress sustained by the Plaintiffs was severe and of a nature that no reasonable person could be expected to endure.

## COUNT VII
### (CONSTITUTIONAL EQUAL PROTECTION)

131.     Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

132.     Springfield violated the Fourteenth Amendment guarantee of equal protection and freedom from racial discrimination by failing to enforce its residency ordinance, as well opposing racial equality, enforcing racial subordination, engaging in favoritism towards white firefighter and employees, and retaliating against persons who protest racial discrimination.

133.     Defendants sought through the arbitrary and capricious enforcement of policy to deter Plaintiffs and other minority firefighter from enjoying their First Amendment rights to freedom of speech and to petition the government for redress of grievances.

134.    Defendants have allowed SPD's appointing authority to arbitrarily and inconsistently apply policies and procedure to achieve predetermined results that advantages white members, and disadvantages racial minorities.

135.    Defendants' unconstitutional unequal enforcement, discriminatory practices, and custom caused Plaintiffs to suffer damages compensable pursuant to 42 U.S.C. § 1981 and § 1983.

136.    Defendants are policymakers for the City of Springfield and their decisions caused Plaintiffs to suffer damages compensable pursuant to 42 U.S.C. § 1981 and § 1983.

137.    Defendants' unconstitutional policy, practice, and custom violates the rights of all minority employees, students, and citizens of the City of Springfield.

## COUNT VII
### (BREACH OF CONTRACT)

138.    Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

139.    SFD members at the rank of District Chief and higher were all required to sign agreement that the would move into the city to comply with the City's residency law.

140.     In light of the language of the contracts and legislative history of the City's residency requirement aimed at promoting greater diversity in fire department hiring and promotions, Plaintiffs were intended beneficiaries of those contracts.

141.    A large number of Chiefs and Deputy Chiefs have breached those contracts.

142.    Defendants' failure to  enforce those contracts against such non-residents has harmed Plaintiff and similarly situated employees as third party beneficiaries to those contracts.

## COUNT VIII
### (PUNITIVE DAMAGES)

143.    Plaintiffs incorporate by reference as if fully stated herein, the above paragraphs.

144.    Defendants showed willful misconduct, malice, wantonness, oppression, or that want

of care which would raise the presumption of conscious indifference to consequences.

145.    Plaintiffs are entitled to an award of punitive damages in the amount to be determined

in the enlightened conscience of a fair and impartial jury, not as compensation to

Plaintiffs, but solely to punish, penalize or deter Defendants from such wrongful conduct

in the future.

## PRAYER FOR RELIEF

146.    WHEREFORE, Plaintiffs request judgment against Defendants as follows:

 A. Declare that the Defendants violated the First and Fourteenth Amendments to the

United States Constitution;

B. Enter Judgment for the Plaintiff and against the Defendants on all Counts;

C. Enjoin the City of Springfield from engaging in its present practices in violation of the

laws cited herein;

D. Award damages sufficient to compensate Plaintiffs, in an amount to be proven at trial;

E. Award punitive damages;

F. Certify the class harmed by Springfield's discriminatory hiring and promotion

practices pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as representatives of the class,

and designate Plaintiffs' counsel as counsel for the class;

G. Establish a reparations fund for persons harmed by the Springfield's discriminatory

hiring and promotion practices;

H. Award attorney's fees and expenses and costs

I. Award such other and further and different relief as this court deems just and

appropriate.

## JURY DEMAND

Plaintiffs demands a trial by jury on all counts.


Respectfully submitted this 9th day of October 2018.
By Plaintiff's Attorney
/s/ Arnold J. Lizana III
MA BBO No. 546161

Law Office of Arnold J. Lizana III P.C.
1350 Main Street, Suite 302
Springfield, Massachusetts 01103
(877) 443-0999
alizana@attorneylizana.com