UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARC SAVAGE and | ) | |
| RANDOLPH BLAKE, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:18-cv-30164-KAR |
| | ) | |
| | ) | |
| THE CITY OF SPRINGFIELD, | ) | |
| BERNARD J. CALVI, individually and | ) | |
| as Fire Commissioner for the City of | ) | |
| Springfield, and JOSEPH CONANT, | ) | |
| individually and as former Fire | ) | |
| Commissioner, | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND DEFENDANTS' MOTIONS TO EXCLUDE
(Dkt Nos. 102, 130, 132, 134, 136, and 138)

ROBERTSON, U.S.M.J.

## I.     Introduction

This is a putative class action brought by plaintiffs Marc Savage ("Savage") and

Randolph Blake ("Blake") (collectively, "Plaintiffs"), a retired and current employee,

respectively, of the Fire Department for the defendant City of Springfield ("City" or

"Springfield").  Also named as defendants are Bernard J. Calvi ("Calvi"), the Fire

Commissioner, and Joseph Conant ("Conant"), the former Fire Commissioner (the City, Calvi,

and Conant are referred to collectively as "Defendants").  Plaintiffs allege that Defendants have

discriminated against Black and Hispanic firefighters by failing to enforce the City's residency

ordinance, which has denied them promotional opportunities, and by maintaining a racially

hostile work environment.  Plaintiffs' surviving claims include discrimination in violation of
Title VII of the Civil Rights Act of 1964 against the City for discrete acts of discrimination
occurring on or after October 26, 2016, for Savage, for discrete acts of discrimination occurring
on or after May 4, 2017, for Blake, and for a hostile work environment (Count One);
discrimination in violation of Mass. Gen. Laws ch. 151B against the City, Calvi, and Conant for
discrete acts of discrimination occurring on or after October 9, 2015, and for a hostile work
environment (Count Two); unlawful retaliation in violation of Title VII of the Civil Rights Act
of 1964 against the City and unlawful retaliation in violation of Mass. Gen. Laws ch. 151B
against the City, Calvi, and Conant (Count Four); and violation of the constitutional guarantee to
equal protection against the City, Calvi, and Conant (Count Seven).  Plaintiffs seek declaratory
and injunctive relief, as well as compensatory and punitive damages.

Plaintiffs have moved for certification of a Federal Rule of Civil Procedure 23(b)(2) class
consisting of "all current and former Black and Hispanic firefighters employed by the
Springfield Fire Department since March 17, 1995."  Defendants have filed a battery of motions
seeking to exclude certain material from consideration in connection with Plaintiffs' motion.  For
the following reasons, Defendant's motion to exclude Plaintiffs' expert declaration (Dkt. No.
130) is DENIED; Defendants' motion to exclude the spreadsheet on which Plaintiffs' expert
relies (Dkt. No. 132) is DENIED; Defendants' motion to exclude news articles (Dkt. No. 134) is
GRANTED; Defendants' motion to exclude certain agency decisions and declarations (Dkt. 136)
is GRANTED in part and DENIED in part; Defendants' motion to exclude portions of Plaintiffs'
declarations submitted in support of the motion for class certification (Dkt. 138) is GRANTED
in part and DENIED in part; and Plaintiffs' motion for class certification (Dkt. No. 102) is
DENIED.

II.      **Background**

A.  The Residency Ordinance

On March 17, 1995, a residency ordinance requiring many municipal employees to reside

in the City as a condition of employment became effective.  *See* Chapter 73, Art. II, §§ 73-8

through 73-17 (Dkt. 103-4).  Pursuant to § 73-8, as amended on September 9, 2013:

> A.      Except as provided for in this article, every person first
> employed by the City of Springfield on or after March 17, 1995,
> shall, within 12 months of the start of employment, be a resident of
> the City of Springfield and shall not cease to be a resident during
> his employment by the City.
>
> …
>
> C.      Notwithstanding the provisions of this article, all
> employees employed by the City of Springfield on March 17,
> 1995, shall be considered to have fully complied with the
> residency provisions of this article.

(Dkt. No. 103-4 at 1).  Regarding promotions, § 73-9 provides that:

> Except as provided for in this article, all persons promoted by the
> City on or after March 17, 1995, shall be or within one year of
> such promotion become a resident of the City as defined herein.
> Failure to do so shall be determined to be voluntary termination of
> employment.

(Dkt. No. 103-4 at 1).  Section 73-10A requires each City employee to file a certificate annually

stating his or her place of residence, and § 73-10B states that:

> Upon receipt of a certificate indicting a place of residence not
> within the City, or if no such certificate is filed, the department
> head or like officer shall forthwith strike the name of the employee
> from the payroll[;] that person shall cease to be employed by the
> City ….  This subsection shall not apply to employees exempted
> from the residency ordinance as provided for in this article.

(Dkt. No. 103-4 at 1).

3

In May of 2016, Savage and others sued the City, the Springfield Fire Department, the Springfield Fire Chiefs Association, and Conant arising from the alleged longstanding noncompliance with the residency ordinance prompted by promotions of nonresident employees of the Fire Department to higher ranking positions (Dkt. No. 111-3 at 1-2).  They sought a declaration of the rights and obligations of the parties regarding enforcement of the residency ordinance (Dkt. No. 111-3 at 2).  On December 28, 2021, following a bench trial, the Superior Court issued its findings of fact and conclusions of law (Dkt. No. 111-3).  Among other things, the court concluded that persons promoted on or after March 17, 1995, if they were already employed by the City on that date, were exempted from the residency requirement attached to promotions (Dkt. No. 111-3 at 7-8).  As a result of this ruling, the court noted that Savage's claim of lost promotional opportunities had not been substantiated on the record before it (Dkt. No. 11-3 at 8 n.8).  In addition, the court concluded that § 73-10B was invalid and unenforceable due to its inconsistency with other provisions of the ordinance establishing a residency compliance commission and residency compliance unit, each of which is endowed with investigative authority, and its conflict with civil service laws prohibiting the summary dismissal of any civil service employee without providing notice and a hearing, or the option to appeal a disciplinary action through a grievance under the collective bargaining agreement (Dkt. No. 111-3 at 10-11).

B.  Savage[1]

Savage, a lifelong resident of the City, was hired by the Springfield Fire Department on February 6, 1978 (Dkt. No. 103-1 at ¶ 3).  In March of 2014, Savage sat for a Deputy Fire Chief examination along with one other applicant, Glenn Guyer ("Guyer"), who was hired in 1987, and

---

[1] The following facts are gleaned from an affidavit Savage submitted in support of the motion for class certification.

never lived in the City, despite being promoted to Lieutenant in 2000 and Captain in 2006 (Dkt. No. 103-1 at ¶¶ 6-10).  Following the posting of the scores, Guyer sought and was denied a waiver of the residency requirement for the position (Dkt. No. 103-1 at ¶ 10).  Thereafter, Conant protested the decision of the Commonwealth's Human Resources Department to hold the examination when there were only two applicants, even though he knew there were only two applicants before the exam was even administered; the Human Resources Department canceled the examination results (Dkt. No. 103-1 at ¶¶ 11-12).  Guyer was allowed to resume service as an Acting Deputy Commissioner and was later appointed permanent Deputy Chief (Dkt. No. 103-1 at ¶ 15).  Guyer refused to sign an agreement to move to Springfield within a year of his appointment to the Deputy Chief position but was allowed to accept the promotion anyway, and his employment was not terminated when he persisted in his refusal to move to the City after the year had elapsed (Dkt. No. 103-1 at ¶¶ 16-18).

On the same date in March 2014 that Savage and Guyer took the Deputy Fire Chief examination, six applicants took the identical examination for the position of District Chief (Dkt. No. 103-1 at ¶ 12).  Savage's score on the examination was sufficient to qualify him for a District Chief position (Dkt. No. 103-1 at ¶ 13).  There were several District Chiefs in violation of the residency ordinance at the time and had the City enforced the ordinance, there would have been at least six other District Chief positions to which Savage could have been promoted (Dkt. No. 103-1 ¶ 14).

According to Savage, Conant acknowledged in his presence that he was continuing an already established policy of not enforcing residency requirements because the City had demonstrated that it was not a priority; that, as the Fire Chiefs Association President, he argued to the City that residency should not be enforced against the District Chiefs because of the long

history of non-enforcement; and that his hands were tied because it was the responsibility of the City's Human Resources Department to enforce residency, not his (Dkt. No. 103-1 at ¶¶ 19-21).

    C.  <u>Blake</u>[2]

    Blake, also a lifelong resident of Springfield, was hired by the Fire Department on April 10, 1989 (Dkt. No. 103-2 at ¶ 3).  In 2018, Blake passed a Captain's examination, appearing second on the list behind Lieutenant Michael Kneeland ("Kneeland"), a white firefighter who was hired in July 2002 and had never lived in Springfield (Dkt. No. 103-2 at ¶ 6-8).  Defendants selected Kneeland over Plaintiff for promotion to Captain (Dkt. No. 103-2 at 9).  Blake was the only individual on the certification list of firefighters who had passed the examination who was in full compliance with the residency law; the individual third on the list was another white firefighter, who did not live in the City (Dkt. No. 103-2 at ¶ 8).  According to Blake, he had also been passed over for Temporary Captain promotions in favor of Kneeland on two prior occasions in 2016 and 2017 (Dkt. No. 103-2 at ¶ 10).

    Blake avers that Conant made the same acknowledgements regarding non-enforcement of residency in his presence that he made in Savage's presence (Dkt. No. 103-2 at ¶¶ 12-14).

    According to Blake, had the City enforced the residency ordinance as well as applicable Civil Service rules in March of 2018, two Captains positions would have opened for which he could have competed (Dkt. No. 103-2 at ¶ 17).  Blake also states that eight or more District Chiefs were in violation of the residency ordinance at the time, and if their employment had been terminated in compliance with the residency ordinance, a total of four positions would have been created per termination, creating a total of thirty-two promotional opportunities (Dkt. No. 103-2

---

[2] The following facts are gleaned from an affidavit Blake submitted in support of the motion for class certification.

at ¶ 17).[3]  In particular, eight Captain spots would have been created for which Blake would have been eligible to compete (Dkt. No. 103-2 at ¶ 17).

      D.   <u>Expert Report of Christopher Erath, Ph. D.</u>

Plaintiffs also submit a declaration from economics expert Christopher Erath, Ph. D. ("Dr. Erath") (Dkt. No. 103-4).  Dr. Erath identifies a spreadsheet created by Plaintiffs' counsel based on data received from the City and public sources, which shows the promotion history of employees of the Fire Department from 1984 to the present, as the basis for his expert opinions (Dkt. No. 103-4 at ¶ 3).  He attaches the spreadsheet, which identifies the ethnicity of each firefighter and indicates whether the individual complied with the residency ordinance, as an exhibit to his declaration (Dkt. No. 103-4, Exhibit B).  Dr. Erath indicates that he was asked to address two questions, as follows: (1) Are there racial differences in the rate at which employees satisfied the City of Springfield's residency requirement?; and (2) Are there racial differences in the composition of the department's officer ranks? (Dkt. No. 103-4 at ¶ 3).  According to Dr. Erath, his understanding was that any firefighter hired or promoted on or after March 17, 1995, was required to live in the City (Dkt. No. 103-4 at ¶ 4).

After analyzing the data, Dr. Erath made the following observations:

- There was a statistically significant difference between the proportion of blacks and whites and, separately, Hispanics and whites, who satisfied the residency ordinance (87.5% compliance rate for blacks, 85.2% for Hispanics, and 50% for whites) (Dkt. No. 103-4 at ¶¶ 5-6);

---

[3] Blake does not explain why termination of the employment of one district chief would create four promotional opportunities.

- There was a statistically significant difference between the proportion of blacks and whites, and separately, Hispanics and whites, who achieved the rank of lieutenant and satisfied the residency ordinance (69% for blacks, 70% for Hispanics, and 36.8% for whites) (Dkt. No. 103-4 at ¶ 8-9);

- Despite a small sample size (only three blacks ever achieved the rank), there was a statistically significant difference between the proportion of blacks and whites who achieved the rank of captain and satisfied the residency ordinance (100% for blacks and 31.9% for whites) (Dkt. No. 103-4 at ¶ 10);

- The overall composition of the department's 420 uniformed employees included 53.1% whites, 30.2% Hispanics, and 16.7% blacks (Dkt. No. 103-4 at ¶ 11);

- The composition of employees who achieved the rank of lieutenant, a total of 131 employees, included 74.8% whites, 15.3% Hispanics, and 9.9% blacks (Dkt. No. 103-4 at ¶ 12);

- The composition of employees who achieved the rank of captain, a total of 57 employees, included 82.4% whites, 12.3% Hispanics, and 5.3% blacks (Dkt. No. 103-4 at ¶ 13);

- The composition of employees who achieved a rank above captain, a total of 31 employees, included 83.9% whites, 9.7% blacks, and 6.5% Hispanics (Dkt. No. 103-4 at ¶ 14).

From his observations, Dr. Erath drew the following conclusions. First, "there was a high and statistically significant correlation between residency compliance and race among uniformed employees of the Springfield Fire Department" (Dkt. No. 103-4 at ¶ 15). Second, "[h]ad Springfield consistently enforced the 1995 residency requirement … the enforcement action would have disproportionately disqualified whites, who were able to maintain representation in

the officer ranks at much higher levels than their overall percentages in the department" (Dkt.

No. 103-4 at ¶ 17).

    E.  <u>Defendants' Motions to Exclude</u>

        *1.  Dr. Erath's Declaration and Spreadsheet*

Defendants move to exclude Dr. Erath's expert declaration and the spreadsheet on which

he relies.  Pursuant to Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to
> determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.  District courts assessing the admissibility of expert testimony must "act as

gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation

and is relevant to the task at hand.'"  *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012)

(quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  The former

requirement, that of reliability, requires that the expert testimony both be based on reliable

methods and be reliably applied.  *Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, No. 19-10364-

FDS, 2021 WL 5868249, at *1-2 (D. Mass. Dec. 10, 2021).  The latter requirement requires the

court to evaluate whether the expert testimony will be helpful to the trier of fact, which requires

the court to determine whether it is relevant, "not only in the sense that all evidence must be

relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Id*. at *2. (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d. 77, 81 (1st Cir. 1998)).

Defendants' attack on Dr. Erath's declaration is targeted at the issue of reliability, not relevance. According to Defendants, Dr. Erath's opinions are not the product of reliable principles and methods, and Dr. Erath failed to apply those principles and methods reliably to the facts of the case. In assessing Defendants' claims regarding methodology, it is helpful to catalogue exactly what Dr. Erath did. Dr. Erath utilized the spreadsheet provided by Plaintiffs' counsel to calculate the percentage of firefighters who satisfied the residency ordinance by race (black, Hispanic, and white), both globally and by rank (firefighter, lieutenant, captain, and above). He then performed Fisher's Exact tests to determine the likelihood that the different compliance rates by race could have occurred by chance. Finally, he calculated the percentage of firefighters of each race (black, Hispanic, and white) who achieved each rank (firefighter, lieutenant, captain, and above). In other words, aside from the application of the Fisher's Exact test, which is a scientifically accepted method of determining statistical significance, *see, e.g., Lopez v. City of Lawrence*, CIVIL ACTION NO. 07-11693-GAO, 2014 WL 12978866, at *11 (D. Mass. Sept. 5, 2014), *aff'd sub nom. Lopez v. City of Lawrence, Mass.*, 823 F.3d 102 (1st Cir. 2016), Dr. Erath performed basic mathematical computations. Thus, there is no basis for the court to conclude that Dr. Erath failed to use reliable methods or that he failed to apply those methods reliably.

Defendants also argue that Dr. Erath's opinions are not based on sufficient facts or data. Because the challenged facts and data are captured in the spreadsheet, Defendants additionally seek to exclude the spreadsheet. The alleged shortcomings are that Dr. Erath: (1) erroneously

10

included in his calculations twenty-two non-resident employees of the Fire Department who were hired before March 17, 1995, and, therefore, are exempt from the residency ordinance; (2) failed to account for the one-year grace period to move into the City; (3) failed to account for the invalidity and unenforceability of the automatic "termination" provision in the residency ordinance; (4) included in his calculations employees who never took or passed the required civil service exam, failed to achieve a high enough score on the exam to be ranked on a civil service promotional eligibility list, and failed to qualify for an interview; (5) and failed to take into account the impact of collective bargaining agreements and the impact of the requirements of labor laws applicable to those agreements.

An expert's methodology is the "central focus of a *Daubert* inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz–Troche,* 161 F.3d at 81. However, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005) (quoting *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir.2005)). "'It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded' on foundational grounds." *Id*. at 309 (quoting *Larson*, 414 F.3d at 941). Application of the general rule is appropriate in this circumstance, where Defendants have had the opportunity to challenge the persuasiveness and relevance of Dr. Erath's opinions by assailing their factual bases in thorough briefing and at oral argument. Accordingly, the court denies Defendants' motions to exclude Dr. Erath's declaration and the spreadsheet on which he relies.

2.  *News Articles*

Defendants move to exclude two news articles Plaintiffs submitted in support of their motion for class certification.  The news articles purportedly show that a black employee and a Hispanic employee had their employment with the City terminated after making offensive social media posts.  This is to be contrasted with the alleged lack of disciplinary action taken against the white firefighters who posted racially and religiously offensive social media posts.

The court grants Defendants' motion to exclude the news articles.  "The court considers only admissible evidence in determining whether Rule 23's requirements are met." *DeRosa v. Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 95 (D. Mass. 2010) (citing *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 937–38 (7th Cir. 1989) (holding that the Rules of Evidence apply in class certification proceedings); *Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 544 (D. Idaho 2010) (same); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 269–70 (D. Mass. 2005) (adopting analytical approach taken in a Southern District of New York case which required a plaintiff to present admissible evidence for class certification)).  Because these articles are offered for the truth of the matters asserted therein, they are inadmissible hearsay, and the court declines to consider them.  *See* Fed. R. Evid. 801(c), 802.

3.  *Agency Decisions and Declarations*

Defendants have filed an omnibus motion to exclude certain agency decisions and declarations from non-parties.  The court addresses each exhibit in turn.

(a)  A decision from the Massachusetts Commission Against Discrimination ("MCAD") finding probable cause to believe that the City of Springfield Fire Department subjected another black employee, Taren Latta, to disparate

treatment, harassment, and retaliation on the basis of race, along with the

underlying complaint (Dkt. 103-11)

The court grants Defendants' motion insofar as it seeks to exclude the MCAD probable

cause decision and associated complaint and will not consider them.  The probable cause

decision may be admissible under the public records exception to the rule against hearsay, *see*

Fed. R. Evid. 803(8); however, the court has determined that it is not relevant to the issue of

whether the Plaintiffs can proceed on a class action basis with respect to their claims that non-

enforcement of the residency ordinance has denied promotional opportunities to minority

candidates.  *See* Fed. R. Evid. 401, 402.  The lengthy MCAD complaint, much of which is itself

hearsay and does not fall within any recognized exception, *see* Fed. R. Evid. 801(c), 802, reveals

that the allegations for which the MCAD apparently found probable cause do not relate to the

residency ordinance or denial of promotional opportunities to minority candidates.  In addition,

the City represents that, after issuing the probable cause finding, the MCAD dismissed the

complaint for reasons that the City has not disclosed (Dkt. No. 111-1 at 40, ¶ 108).  The

allegations do detail a racially hostile work environment, and Plaintiffs have brought claims for a

racially hostile work environment based on offensive social media posts.  However, for reasons

discussed below, the court is limiting its consideration to whether Plaintiffs are entitled to

certification of the requested class relative to their claims arising from the alleged failure to

enforce the residency requirement.

(b) A table of offensive social media posts (Dkt. 103-8)

The court grants Defendants' motion insofar as it seeks to exclude the table of offensive

social media posts and will not consider it.  The offensive posts set forth in the table are not

relevant to the issue of whether this court should certify a class relative to Plaintiffs' claims

arising from the city's alleged failure to enforce the residency requirement.  As will be addressed

below, this is the limit of what the court is considering.

> (c)  A civil service decision regarding another black firefighter, Jeris Mitchell
>
> (Dkt. 103-12)

The court grants Defendants' motion insofar as it seeks to exclude the civil service

decision and will not consider it.  While the decision may be admissible under the public records

exception to the rule against hearsay, *see* Fed. R. Evid. 803(8), it is not relevant to the class

certification issue based on non-enforcement of the City's residency ordinance.  The decision

found that the Fire Department had applied Mass. Gen. Laws ch. 31, § 58, in an arbitrary and

capricious manner.  Section 58 provides in relevant part:

> If any person who has resided in a city or town for one year
> immediately prior to the date of examination for original
> appointment to the police force or fire force of said city or town
> has the same standing on the eligible list established as the result of
> such examination as another person who has not so resided in said
> city or town, the administrator, when certifying names to the
> appointing authority for the police force or the fire force of said
> city or town, shall place the name of the person who has so resided
> ahead of the name of the person who has not so resided; provided,
> that upon written request of the appointing authority to the
> administrator, the administrator shall, when certifying names from
> said eligible list for original appointment to the police force or fire
> force of a city or town, place the names of all persons who have
> resided in said city or town for one year immediately prior to the
> date of examination ahead of the name of any person who has not
> so resided.

Mass. Gen. Laws ch. 31, § 58.  In Jeris Mitchell's case, the Civil Service Commission found that

he was denied "a fair, impartial review process, including a residency verification process that

should have been conducted in a uniform manner, with the same standards applied equally to all

candidates" (Dkt. No. 103-12 at 11-12).  The decision is of limited relevance to Plaintiffs in this

case because they are seeking certification regarding the non-enforcement of the City's residency

ordinance, not Mass. Gen. Laws ch. 31, § 58.  In addition, while Mr. Mitchell is black, there is

no suggestion in the decision that race played a role in the irregularities that occurred relative to

chapter 58 or that Mr. Mitchell was bypassed by a white applicant.

> (d) A declaration from Joshua Venditto, a black firefighter whose employment
>     was terminated for violating the residency requirement, despite his
>     compliance with instructions (Dkt. No. 103-5)

The court denies Defendants' motion insofar as it seeks to exclude the declaration from

Joshua Venditto.  Mr. Venditto, a black man, avers in his declaration that his employment with

the Fire Department was terminated for failure to comply with the residency ordinance that is at

issue in this case.  Thus, it is relevant.  The court will also consider Defendants' contrary

evidence that Mr. Venditto's employment was instead terminated based on his failure to show up

for work on time during the period of his probationary employment.

> (e) A declaration authored by former City Councilor Bud Williams (Dkt. No.
>     128-1)

The court grants Defendants' motion insofar as it seeks to exclude the declaration from

Bud Williams.  Mr. Williams, a former City Councilor, avers that he supported passage of the

residency ordinance for several reasons, but one of his primary motivations was to help the City

improve the diversity of municipal employees and that there was discussion and debate among

the Council members about a vigorous enforcement of the residency ordinance having the added

benefit of making applicant pools for municipal opportunities more diverse.  Because the

legislative history of the ordinance is not in issue, the court finds that the declaration is not

relevant and excludes it from consideration.

15

4. *Portions of Plaintiffs' Declarations*

Defendants have moved to exclude portions of Plaintiffs' declarations pursuant to Fed. R. Evid. 403 and 404 as irrelevant, and argued that to the extent they are relevant, such relevance is substantially outweighed by the danger of unfair prejudice, confusion, and potential to mislead a fact finder.  Defendants make no argument in support of these conclusions.  The paragraphs address: (1) the news articles involving other minority employees who worked outside of the Springfield Fire Department and had their employment terminated for social media activity; (2) offensive social media posts by other employees of the Springfield Fire Department without imposition of discipline; and (3) statements concerning the application of the residency ordinance relative to Guyer's promotions and Kneeland's promotions.  The court will grant Defendants' motion to the extent it seeks to exclude the paragraphs of the declarations addressing the news articles and the offensive social media posts, each of which the court has excluded.  The court finds that the other paragraphs are relevant.  Claims of possible unfair prejudice and confusion are not of concern to the court.

## III.   Standards for Class Certification

A district court must conduct a "rigorous analysis" under Rule 23 before certifying a class. *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  A class may be certified only if a plaintiff shows that the class meets all four of the requirements of Fed. R. Civ. P. 23(a), as well as the requirements of 23(b)(1), (b)(2), or (b)(3).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).  The four threshold requirements of Rule 23(a) include: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the

class"); and (4) adequacy ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). Plaintiffs here seek certification under Rule 23(b)(2) and, therefore, they must also show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "[D]istrict courts have broad discretion to grant or deny class certification." *DeRosa*, 694 F. Supp. 2d at 95 (quoting *McCuin v. Sec'y of Health and Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).

## IV.  Discussion

### A.  Preliminary Issues

#### 1.  Issue Preclusion

Neither party has directly addressed the effect of the Superior Court's December 28, 2021, ruling on the enforceability and interpretation of the residency ordinance on Plaintiffs' motion for class certification. The City posits that this court can take judicial notice of the Superior Court decision and appears to assume that this court is bound by the decision (Dkt. No. 111 at 14, 20). Plaintiffs appear to argue that rulings issued by the Superior Court in 2017 show that the residency ordinance is valid and enforceable on terms that, in their view, support their claims. Plaintiffs either do not acknowledge the import of, or reject, relevant aspects of the December 2021 Superior Court decision (Dkt. No. 103 at 9; Dkt. No. 128 at 13). The court takes judicial notice that final judgment in the Superior Court case entered on April 15, 2022, and that Plaintiffs' motion to file a notice of appeal late was allowed and the case entered on the docket of the Massachusetts Appeals Court on July 6, 2022. Relevant principles dictate that this court give preclusive effect to the Superior Court judgment.

This court "appl[ies] Massachusetts law to determine the preclusive effect of the state-

court judgment." *Alston v. Town of Brookline*, 997 F.3d 23, 36 (1st Cir. 2021).

> Issue preclusion … "bars parties from re-litigating issues of either fact or law that
> were adjudicated in an earlier proceeding." *Robb Evans & Associates, LLC v.
> United States*, 850 F.3d 24, 31 (1st Cir. 2017). Issue preclusion requires three
> elements: (1) a final judgment on the merits in the previous action; (2) the party
> against whom preclusion is asserted was a party (or in privity with a party) to the
> prior action; and (3) the issues in the prior and current adjudication are identical.
> *Kobrin v. Bd. of Registration in Med.*, 444 Mass. 837, 843 (2005); *Tuper v. N.
> Adams Ambulance Serv., Inc.*, 428 Mass. 132, 134 (1998). In addition, "[i]ssue
> preclusion can be used only to prevent relitigation of issues actually litigated in
> the prior action" that were essential to the earlier judgment." *Kobrin*, 444 Mass.
> at 844.

*Kupperstein v. Baker*, Civil Action No. 20-11868-FDS, 2021 WL 3079887 (D. Mass. July 21,

2021). Issue preclusion applies when the party had a full and fair opportunity to litigate the issue

that was decided in the prior litigation. *Id.*

Applying the issue preclusion factors set out above, Massachusetts law provides that "a

trial court judgment is final and has preclusive effect regardless of the fact that it is on appeal."

*O'Brien v. Hanover Ins. Co.*, 692 N.E.2d 39, 44 (Mass. 1998). Thus, the Superior Court ruling is

a final judgment on the merits. Savage was the lead plaintiff in the prior Superior Court

litigation and Blake's interests are wholly aligned with Savage's interests. To the extent the

relief Plaintiffs seek in this action depends on the interpretation and enforceability of the City's

residency ordinance, which, to a significant extent, it does, the issues in the Superior Court case

are identical to the issues in this case, and those issues were actually litigated and essential to the

prior judgment. This court should avoid "gratuitous interference … with an orderly and

comprehensive suit pending in state court, presenting the same issues, not governed by federal

law, between the same parties." *Scottsdale Ins. Co. v. MRH Indian Enters. LLC*, Civil Action

No. 19-cv-11878-ADB, 2020 WL 3545512, at *2 (D. Mass. June 30, 2020) (quoting *Flectat Ltd.*

*v. KASL Seabreeze, LLC*, 257 F. Supp. 3d 152, 156-57 (D. Mass. 2017) (alteration in original)).
This court will not revisit issues related to the residency ordinance that were decided by the
Superior Court.

> 2.   Class Claims

As set forth above, Plaintiffs seeks to certify a class of "all current and former Black and
Hispanic firefighters employed by the Springfield Fire Department since March 17, 1995."  At
oral argument, counsel for Plaintiffs identified the primary class claim as emanating from the
City's "arbitrary and capricious" enforcement of the residency ordinance.  Plaintiffs further
allege that the City has a practice of maintaining a racially hostile and retaliatory work
environment and seek to include hostile work environment as a claim asserted on behalf of the
class (Dkt. No. 103).  In ruling on the defendants' motion to dismiss, this court held that
Plaintiffs had adequately alleged that *they* were subjected to a hostile work environment (Dkt
No. 91 at 14-15, 19).  As to the allegations of a hostile work environment on behalf of a class,
the evidence falls far short.  First, while Plaintiffs seek to represent a class of minority
firefighters from March 17, 1995, to the present, there is little to no evidence to support a hostile
workplace claim prior to 2016, after which there is evidence in the form of social media posts
(Dkt. No. 103-8).  Notably, the declarations of the named Plaintiffs are silent in this regard (Dkt.
Nos. 103-1, 103-2).  Second, most of the social media posts on which Plaintiffs rely to support a
hostile work environment appear directed at Plaintiffs personally.  The same is true with respect
to allegations in the Taren Latta discrimination charge (which, in any event, is of dubious
admissibility and value for reasons explained above).  Moreover, twenty-three of the thirty-two
social media posts are directed at religion (Muslim) rather than at race or ethnicity (Dkt. No.
103-9).  There are no affidavits from any potential class member attesting to having experienced

a hostile work environment based on race or ethnicity.  *Contrast, e.g., Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 218-19 (N.D. Ill. 2014) (certifying a class of African American ComCast employees claiming to having been subjected to a hostile work environment based on race in reliance on evidence that six of the twelve named plaintiffs reported hearing an egregious racial slur from a Comcast supervisor, and eleven of the twelve heard at least one phrase that plaintiffs contended was racist or racially hostile).  Plaintiffs have the burden of proving that class certification is appropriate, *DaRosa*, 694 F. Supp. 2d at 95, and as to a hostile work environment claim, they have not satisfied their burden.  The court denies the aspect of Plaintiff's motion that proposes, based on scant if any evidence, to certify a hostile work environment class of black and Hispanic firefighters from 1995 to the present.  *See Burton v. Dist. of Columbia*, 277 F.R.D. 224, 229-230 (D.D.C. 2011) (declining to certify a hostile work environment class of African American firefighters because the allegations of a hostile work environment were either conclusory or relied on comparisons of treatment based on facts that were distinguishable).  Thus, the court limits its consideration to whether Plaintiffs are entitled to certification of a class of "all current and former Black and Hispanic firefighters employed by the Springfield Fire Department since March 17, 1995," relative to their claims arising from the alleged failure to enforce the residency requirement.

B.  Rule 23(a)

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.  The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – 'effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims.'""  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  "[C]ertification

is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* at 350-51 (quoting *Falcon*, 457 U.S. at 161).

       *1. Numerosity*

       "The numerosity requirement of Rule 23(a)(1) is satisfied when the class is 'so numerous that joinder of all members is impracticable.'" *DeRosa*, 694 F. Supp. 2d at 97 (quoting Fed. R. Civ. P. 23(a)(1)). Plaintiffs have represented that the proposed class contains at least fifty minority firefighters who were denied promotion opportunities (Dkt. No. 103 at 14). This figure would be sufficient to satisfy numerosity. *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("'[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.'")). Defendants, however, challenge the accuracy of Plaintiffs' figure.

       The court finds that Plaintiffs' calculation of fifty putative class members is insufficiently supported. Plaintiffs rely on three pieces of evidence purportedly underpinning the class of at least fifty members. On careful examination, the evidence does not substantiate the figure. First, Plaintiffs cite to three paragraphs of Dr. Erath's declaration, which are not directed at the question of how many minority firefighters were denied promotional opportunities; instead, the paragraphs address the racial composition of the ranks of lieutenant, captain, and above (Dkt. No. 103-4 at ¶¶ 12-14). Indeed, nowhere in Dr. Erath's declaration does he opine on the numerosity issue. Second, Plaintiffs cite to certain testimony of Savage in the Superior Court trial, in which Savage was asked how many promotional opportunities would have opened in the department had eight individuals who were ahead of him in rank and were in violation of the residency ordinance been removed from the payroll (Dkt. No. 103-15 at 8-9). Savage responds

with some calculations that he does not adequately explain and arrives at a figure of thirty-four (Dkt. No. 103-15 at 9). Not only is it not clear how Savage arrived at this figure, but also it is not fifty and, in fact, is less than the threshold of forty. Finally, Plaintiffs cite to Blake's affidavit (Dkt. No. 103-2 at ¶ 18). It is true that Blake states that "[t]here are at least 50 minority firefighters who were denied promotion opportunities" (Dkt. No. 103-2 at ¶ 18). However, Blake makes no effort to explain how he arrived at this figure and, therefore, it is of no value to Plaintiffs in establishing numerosity. At most, Blake offers a statement about how thirty-two promotional opportunities could have opened in the department. He avers that there were eight District Chiefs in violation of the residency ordinance as of March 2018 and that if the employment of each of those eight individuals had been terminated, it would have created four promotional opportunities for each position. It is by no means obvious why the termination of employment for one employee would open four promotional opportunities, and Blake does not explain why he claims this would occur. Even if he had a credible explanation, this resultant figure of thirty-two does not push the putative class above the forty-member threshold.

Moreover, there are a number of flawed assumptions Plaintiffs make in their calculations in support of their motion for class certification. First, Dr. Erath bases his opinions on his understanding that "any firefighter hired or promoted on or after March 17, 1995, was required to live in the City of Springfield" (Dkt. No. 103-4 at ¶ 4). This understanding is at odds with the conclusion of the Superior Court that any firefighter hired before March 17, 1995, was exempted from the requirements of the residency ordinance, even if that individual was promoted after that date (Dkt. No. 111-3 at 6-8). According to Defendants, this eliminates at least twenty-two white

firefighters from consideration (Dkt. No. 111-1 at ¶53).[4]  Not only that, but a review of the data

on which Plaintiffs' expert relies reveals that only nine Deputy Chiefs had hire dates after March

17, 1995 (Dkt. No. 103-4 at 1).  Of those nine, two are Hispanic and in compliance with the

residency ordinance, two are black and in compliance with the residency ordinance, and one is

white and in compliance with the residency ordinance.  This leaves only four white deputy chiefs

who were not in compliance with the residency ordinance and who, according to Plaintiffs,

should have been removed from payroll.  Even accepting Blake's speculative averment that each

vacant Deputy Chief position would open four positions for promotion, this only amounts to

sixteen lost promotional opportunities, not the thirty-two Blake calculated.

Another problem for Plaintiffs is the premise that the District Chiefs who were allegedly

in violation of the residency ordinance should have been removed from payroll.  The Superior

Court deemed this elimination provision of the ordinance invalid and unenforceable (Dkt. No.

111-3 at 9-11).  It is not clear that the employment of these individuals would have been

terminated following the notice and opportunity to be heard to which the court determined they

would have been entitled under civil service rules.

Plaintiffs also fail to account for the fact that, to be eligible for promotion, a candidate

would have to take the civil service exam and pass with a high enough score to be ranked for an

interview and then perform well in the interview.  Thus, Plaintiffs have not shown that the class

they propose excludes individuals who would not be entitled to the relief sought in this suit.

Plaintiffs try to account for this shortcoming by claiming that the City's failure to enforce the

residency requirement and an alleged hostile work environment within the Fire Department

---

[4] Of particular note, one of the white firefighters who would be eliminated is Guyer, who was
hired in 1987, and who, according to Plaintiffs was wrongfully promoted to Deputy Chief in
2015 instead of Savage.

created a chilling effect on minority firefighter's willingness to sit for the civil service exams. But this proposition is not backed by any evidence. Neither Savage nor Blake identifies any test from which they were deterred from sitting, nor have they presented affidavits from any other minority firefighters substantiating the claimed chilling effect.

The bottom line for Plaintiffs is that they have failed to meet their burden of showing that the proposed class is "so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1), by demonstrating that the potential number of plaintiffs exceeds forty individuals. Therefore, the numerosity requirement is not met.

2. *Commonality*

Because Plaintiffs fail to satisfy the numerosity inquiry, class certification is precluded. In the interests of thoroughness, however, the court addresses the other factors. *See Schonton v. MPA Granada Highlands, LLC*, Case No.: 16-cv-12151-DJC, 2019 WL 1455197, at *9 (D. Mass. Apr. 2, 2019). Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is a 'low hurdle,' *Swack*, 230 F.R.D. at 258, and even a single common question can satisfy this element." *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 301 (D. Mass. 2021) (citing *Dukes*, 564 U.S. at 359).

Plaintiffs argue in their papers that the "common questions of law and facts are whether the City discriminated against Black and Hispanic firefighters in the Springfield Fire Department, in violation of the First and Fourteenth Amendments of the United States Constitution, Title VII of the Civil Rights Act of 1964, M.G.L. c. 151B, and 42 U.S.C. §§ 1981, 1983, and 1988 by maintaining a racially hostile work environment and allowing white applicants to violate the City's valid and enforceable residency law for well over 20 years, and

retroactively excusing white firefighters from compliance with the residency law after Plaintiff

filed lawsuits challenging the City's enforcement practices" (Dkt. No. 103 at 20).

While there are problems with Plaintiffs' formulation, those problems area not fatal.  To

start, Plaintiffs have not asserted a claim against Defendants for violation of the First

Amendment.  "As for claims under 28 U.S.C. § 1981 … the '"exclusive federal remedy for

violation of the rights guaranteed in § 1981 by state governmental units" is section 1983.'"

*Howell v. City of Lowell*, Civil Action No. 21-11974-AK, 2022 WL 1423327, at *2 (D. Mass.

May 5, 2022) (quoting *Alston*, 997 F.3d at 42).  Accordingly, "a plaintiff 'may not bring claims

for damages under 42 U.S.C. § 1981 against state actors.'"  *Alston*, 997 F.3d at 42 (quoting

*Buntin v. City of Boston*, 857 F.3d 69, 70 (1st Cir. 2017)).  Finally, § 1988 merely provides for

attorney's fees to the prevailing party in any action or proceeding brought to enforce a provision

of § 1983; in other words, none of Defendants can be said to have violated § 1988, even if

Plaintiffs establish that their conduct was unlawful.

Thus, what is left are Plaintiffs' claims pursuant to Title VII, Mass. Gen. Laws 151B, and

§ 1983 for violation of the right to equal protection.[5]  Pursuant to *Dukes*, it is not sufficient for

Plaintiffs to merely allege "that they have all suffered a violation of the same provision of law,"

*id.*, 564 U.S. at 350, which is precisely what Plaintiffs have done in their proposed common

question.  Rather, the putative class members' claims must depend on a common contention that

"must be of such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each of

the claims in one stroke."  *Id*.  The *Dukes* court went on to explain that "Rule 23 does not set

---

[5] "The legal standards for establishing a violation of Mass. Gen. Laws ch. 151B, § 4 are the same as those for establishing a Title VII claim."  *DeRosa*, 694 F. Supp. 2d at 92 n.2 (citations omitted).  Thus, the court's analysis will proceed in reference to Title VII, which will be equally applicable to the ch. 151B, § 4 claims.  *Id.*

forth a mere pleading standard.  A party seeking class certification must affirmatively

demonstrate his compliance with the Rule – [including] that …there are in fact sufficiently …

common questions of law or fact …. *Id*.  In connection with answering this question, at times, it

may be "necessary for the court to probe behind the pleadings before coming to rest on the

certification question." *Id*. (quoting *Falcon*, 457 U.S. at 160).  The "rigorous analysis" required

to determine whether the prerequisites of Rule 23(a) are satisfied "[f]requently … will entail

some overlap with the merits of the plaintiff's underlying claim." *Id*.

     Keeping this guidance in mind, the court first examines whether Plaintiffs have

established commonality with respect to their claim for violation of the constitutional guarantee

of equal protection.  The Equal Protection Clause "prohibits a state from treating similarly

situated persons differently because of their classification in a particular group." *Mulero-

Carrillo v. Román-Hernández*, 790 F.3d 99, 105-06 (1st Cir. 2015).  "To establish

an equal protection claim, a plaintiff needs to allege facts showing that '(1) the [plaintiff],

compared with others similarly situated, was selectively treated; and (2) ... such selective

treatment was based on impermissible considerations such as race, religion, intent to inhibit or

punish the exercise of constitutional rights, or malicious or bad faith intent to injure a

person.'" *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*,

60 F.3d 906, 910 (1st Cir. 1995)).  "[O]fficial action will not be held unconstitutional solely

because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro.

Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  To the contrary, "[p]roof of racially

discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."

*Id*. at 265.  *See also Asociación Hosp. Del Maestro, Inc. v. Becerra*, 10 F.4th 11, 18 (1st Cir.

2021).  Government policy can violate equal protection either: (1) on its face because of its

unvarnished use of racial classifications, *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998); (2) when a facially neutral policy is applied in discriminatory manner, *id*. at 17; or (3) when a facially neutral policy is motivated by discriminatory animus, and, as applied, has discriminatory effect. *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997). *See Boston's Child. First v. Bos. Sch. Comm.*, 260 F. Supp. 2d 318, 331 (D. Mass. 2003), *aff'd sub nom. Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71 (1st Cir. 2004).

The first alternative does not apply to the residency ordinance, which is racially neutral on its face. The ordinance does not divide City employees by racial categories, nor does it specify different enforcement for different employees based on race or ethnicity. Nor is there competent evidence that the residency ordinance has been applied in a discriminatory manner. Plaintiffs have produced a declaration from a single black candidate for the Fire Department, Joshua Venditto, who avers that his employment was terminated 30 minutes before his pinning ceremony because he was not a resident of the City. Even assuming the accuracy of Mr. Venditto's representations, which the City contests, enforcement of the residency ordinance against one minority firefighter does not establish that the ordinance was applied in a racially discriminatory manner. This is particularly true where the spreadsheet on which Plaintiffs' expert relies shows that there were at least twenty-four black or Hispanic firefighters on the payroll who stood in violation of the residency ordinance, including two who were promoted to captain and eight who were promoted to lieutenant, and against whom the residency ordinance was apparently not enforced. This leaves only the third alternative, whereby Plaintiffs would have to show that Defendants adopted a policy, which, while facially neutral, was motivated by discriminatory animus and had a discriminatory effect on minority firefighters. "'Discriminatory purpose,' … implies more than intent as volition or intent as awareness of consequences." *Pers.*

27

*Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citing *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 179 (1977) (concurring opinion)).  Instead, it "implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*.

Plaintiffs have offered no evidence of such discriminatory animus underlying the non-enforcement of the residency ordinance.  The only evidence they have offered are the statements in their affidavits that they say were made by Conant to the effect that he was continuing an already established policy of not enforcing residency requirements because the City had demonstrated that it was not a priority; that, as the Fire Chiefs Association President, he argued to the City that residency should not be enforced against the District Chiefs because of the long history of non-enforcement; and that his hands were tied because it was the responsibility of the City's Human Resources Department to enforce residency, not his.  Given the absence of evidence of discriminatory intent, the court cannot conclude that Plaintiffs are entitled to class certification of their Equal Protection claim.

This leaves Plaintiffs' Title VII disparate impact claim.[6]  "[A] 'disparate impact' claim involves <u>unintentional</u> discrimination whereby a neutral policy or employment practice has a disparate impact on members of a protected class."  *Frith*, 2022 WL 2313938, at *3 n.6 (citing *Jones v. City of Boston*, 752 F.3d 38, 46 (1st Cir. 2014)).  Specifically, Title VII bars the use of facially neutral "'employment practices that cause[ ] a disparate impact on the basis of race' unless those practices are justified by business necessity."  *Luceus v. Rhode Island*, 923 F.3d

---

[6] Plaintiffs also state that they are bringing a disparate treatment claim, but a disparate treatment claim is a claim of intentional discrimination, *Frith v. Whole Foods Mkt., Inc.*, No. 21-1171, 2022 WL 2313938, at *3 (1st Cir. June 28, 2022) (citing *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 112 (1st Cir. 2015)), and, as discussed, they have not come forward with proof of discriminatory intent.

255, 257 (1st Cir. 2019) (quoting *Jones*, 752 F.3d at 46). "To certify a disparate impact class, …

the plaintiff's claims as to those three elements must be based on 'common contention[s]' that

are 'capable of classwide resolution.'" *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022)

(quoting *Dukes*, 564 U.S. at 350). Here, regarding the first element, the facially neutral

employment practice allegedly causing the disparate impact is the failure to enforce the

residency requirement. "Where, as here, a plaintiff identifies a discrete employment policy that

allegedly results in discrimination, Title VII disparate impact claims are well suited for classwide

adjudication: the policy either disparately impacted the plaintiff class or it did not." *Id*. at 712.

And, if it did, it was either justified by business necessity or it was not. *Id*.

Defendants resist the conclusion that commonality has been met, arguing that the

question of whether the City met its obligations under Title VII must be answered separately for

each employee based on individualized questions of law and fact based on each employee's

situation (Dkt. No. 111 at 45-46). Defendants' argument misses the mark. "Rule 23(a)(2) does

not require that all questions of law or fact raised in the litigation be common, and in fact, 'for

purposes of Rule 23(a)(2) [e]ven a single [common] question will do.'" *George v. Nat'l Water

Main Cleaning Co.*, 286 F.R.D. 168, 174 (D. Mass. 2012) (quoting *Dukes*, 564 U.S. at 359). The

fact that individual questions remain goes not to commonality, but to predominance, *id*. at 175,

an issue this court need not tackle as Plaintiffs have not sought certification under Rule 23(b)(3).

The putative class members allege to have suffered the same injury, i.e., deprivation of

promotional opportunities, from the same source, i.e., non-enforcement of the residency

ordinance. The "claims of harm arising from a truly common source … can provide the common

contention required for a class action." *Id*. Thus, Plaintiffs' Title VII claim successfully clears

the low hurdle of establishing commonality.

### 3.  *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The Supreme Court has observed that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 350, n.5 (quoting *Falcon*, 457 U.S. at 157-58, n.13).  "Commonality looks at the relationship among the class members generally, while typicality focuses on the relationship between the proposed class representative and the rest of the class."  *George*, 286 F.R.D. at 176 (citation omitted).

Typicality is met when the representative's claims "'arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members, and … are based on the same legal theory.'"  *García-Rubiera*, 570 F.3d at 460 (alterations in original) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  "The 'plaintiff[ ] need not show substantial identity between [her] claims and those of absent class members, but need only show that [her] claims arise from the same course of conduct that gave rise to the claims of the absent members.'"  *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 310 (D. Mass. 2004) (quoting *Priest v. Zayre Corp.,* 118 F.R.D. 552, 555 (D. Mass. 1988)).  "In evaluating typicality, the Court seeks to ensure that the "named plaintiff[s], in presenting [their] case, will necessarily present the claims of the absent plaintiffs."  *George*, 286 F.R.D. at 176 (quoting *Randle v. Spectran*, 129 F.R.D. 386, 391 (D. Mass. 1988)).  "The typicality requirement 'is intended to preclude certification of those cases where the legal theories of the named plaintiffs

potentially conflict with those of the absentees,' and, to that end, requires 'that common claims are comparably central' to both the claims of the named plaintiffs and those of the absentees." *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 296 (D. Mass. 2011) (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)). Typicality is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 24-25 (D. Mass. 2003).

Plaintiffs' Title VII claims are so interrelated with the class's claims that the interests of the class members would be protected. The Plaintiffs' alleged injuries – deprivation of promotional opportunities, unpaid wages, and unpaid benefits – are representative of the class's injuries and arise out of the same policy of alleged non-enforcement of the residency ordinance. In addition, the claims of Plaintiffs and the proposed class are based on the same legal theory. The court finds that the typicality requirement is met.

### 4. Adequacy

Pursuant to Fed. R. Civ. P. 23(a)(4), the proposed class representative must "fairly and adequately protect the interests of the class." The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Gonzalez v. XPO Last Mile, Inc.*, CIVIL ACTION NO. 1:19-10290-TSH, 2022 WL 95930, at *5 (D. Mass. Jan. 10, 2022) (quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). The class representatives must be part of the class, possess the same interest, and suffer the same injury as class members. *See Amchem*, 521 U.S. at 625-26.

Plaintiffs argue that they are adequate representatives because they have no conflicts of interest with the proposed members of the class; to the contrary, their interests in ensuring that Defendants are held accountable for their discriminatory promotion practices are perfectly aligned.  Further, Plaintiffs argue that they have retained counsel qualified and experienced in employment discrimination and civil rights matters, who has and will continue to vigorously prosecute the case.  Defendants do not dispute the qualifications of counsel but argue that Plaintiffs have interests that are likely to conflict with the interests of absent class members.  Defendants do not elaborate on what those conflicts would be.

The court finds that Plaintiffs have the better of the argument and have established adequacy of representation.  Plaintiffs have a long history of seeking to enforce the residency requirement for employees of the City's Fire Department, demonstrating their commitment on this issue.  The court can see no conflict between Plaintiffs and other current and former minority employees of the Fire Department, who would have the same interest in ensuring enforcement of the residency ordinance and recovering unpaid wages and benefits from Defendants.  Plaintiffs have also shown their lawyer to be well-qualified and capable of litigating this matter.  Thus, the court finds that the adequacy requirement is met.

C.  Rule 23(b)(2)

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Supreme Court discussed the parameters of certification under Rule 23(b)(2) in *Dukes*.  In *Dukes*, the putative 23(b)(2) class alleged that their employer, Walmart, had committed employment discrimination on the basis of sex in violation of Title VII, and sought

32

injunctive and declaratory relief, as well as backpay.  *Id*. at 342.  The Court held that the class

had been improperly certified as to the backpay claim.  *Id*. at 360.  Claims for monetary relief

may not be certified under Rule 23(b)(2), "at least where . . . the monetary relief is not incidental

to the injunctive or declaratory relief."  *Id*. at 360.  Thus, the rule does not "authorize

class certification when a class member would be entitled to an individualized award of

monetary damages."  *Id*. at 360-61.  Such individualized monetary claims instead belong in Rule

23(b)(3).  *Id*. at 362.  The Court reached its holding at least in part because Rule 23(b)(2) lacks

an opt-out mechanism and does not obligate the district court to notify class members of a

pending action.  *Id.* at 362-63.  The Court in *Dukes* explained that "[i]n the context of a class

action predominantly for money damages we have held that absence of notice and opt out

violates due process."  *Id.* at 363.

   Incidental damages that are permissible under Rule 23(b)(2) are those that "would flow to

the class as a whole by virtue of its securing the sought after injunctive relief."  *Newberg on

Class Actions* § 4:36 (5th ed.) (citing *Dukes*, 564 U.S. at 365).  Therefore, the only type of

monetary damages that may be sought in Rule 23(b)(2) class actions are those that "are group-

based, flow ineluctably from the injunctive or declaratory relief to the class as a whole, and that

do not require individualized assessments."  *Newberg on Class Actions* § 4:37 (5th ed.).  The

monetary damages Plaintiff seek do not meet these requirements.  Plaintiffs' counsel

acknowledged at oral argument that the award of damages would require individualized

assessment for each minority firefighter denied a promotional opportunity.  For example, Blake

asserts in his affidavit that the promotions he was denied resulted in at least $20,000 of annual

lost income and benefits.  This figure would be different for each member of the proposed class

and would not be incidental to the injunctive or declaratory relief.  Thus, *Dukes* plainly bars certification of a Rule 23(b)(2) class as sought by Plaintiffs.

Furthermore, there is reason to doubt that the court can enter injunctive or declaratory relief that would be appropriate for the class as a whole because Plaintiffs seek injunctive or declaratory relief that would conflict with the Superior Court's rulings concerning the residency ordinance.  As relief, Plaintiffs seek an order from this court directing the City to "comply with the residency ordinance by striking from the payroll all persons currently in violation of the city's residency ordinance;" and "freez[ing] all promotion eligibility lists for position levels of Captain and above until compliance with the residency ordinance is achieved by the City" (Dkt. No. 75, Amended Compl., at 37).  The Superior Court ruled that § 73-10B of the residency ordinance, which requires the City to strike from the payroll any person who is not a resident of the City, was invalid and unenforceable.  Further, the Superior Court held that individuals hired as firefighters prior to March 17, 1995, were wholly exempt from the residency requirement (Dkt. No. 111-3 at 6-8, 9-11).  Giving these rulings the preclusive effect to which they are entitled, this court cannot strike any Fire Department employee from the City's payroll and there is no basis for freezing promotion eligibility lists until the time that such a purge has taken place.

## V.    ORDER

For the above-stated reasons, Defendant's motion to exclude Plaintiffs' expert declaration (Dkt. No. 130) is DENIED; Defendants' motion to exclude the spreadsheet on which Plaintiffs' expert relies (Dkt. No. 132) is DENIED; Defendants' motion to exclude news articles (Dkt. No. 134) is GRANTED; Defendants' motion to exclude certain agency decisions and declarations (Dkt. 136) is GRANTED in part and DENIED in part; Defendants' motion to exclude portions of Plaintiffs' declarations submitted in support of the motion for class certification (Dkt. 138) is

GRANTED in part and DENIED in part; and Plaintiffs' motion for class certification (Dkt. No.

102) is DENIED.

It is so ordered.

Dated: July 14, 2022                                   /s/ Katherine A. Robertson_____
                                                      KATHERINE A. ROBERTSON
                                                      United States Magistrate Judge