1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                    )
4    MARC SAVAGE, et al.,           )
                                    )
5            Plaintiffs,            )
                                    )    Civil Action
6    v.                             )    No. 3:18-cv-30164-KAR
                                    )    Pages 1 to 56
7    CITY OF SPRINGFIELD, et al.,   )
                                    )
8            Defendant.             )
                                    )
9

10

11       BEFORE THE HONORABLE KATHERINE A. ROBERTSON
               UNITED STATES MAGISTRATE JUDGE
12

13              FINAL PRETRIAL CONFERENCE

14

15                    June 7, 2024
                      11:18 a.m.
16

17              United States Courthouse
              300 State Street, Suite 120
18          Springfield, Massachusetts 01105

19

20

21

22            Linda Walsh, RPR, CRR
                Official Court Reporter
23     John J. Moakley United States Courthouse
              One Courthouse Way
24          Boston, Massachusetts 02210
              lwalshsteno@gmail.com
25

1    APPEARANCES:

2    On Behalf of the Plaintiffs:

3        LAW OFFICE OF ARNOLD J. LIZANA III P.C.
         By: Arnold J. Lizana III, Esq.
4        1350 Main Street, Suite 302
         Springfield, Massachusetts 01103
5        877-443-0999
         alizana@attorneylizana.com

6

7    On Behalf of the Defendants:

8        Attorney Edward M. Pikula
         1350 Main Street, Suite 312
9        One Financial Plaza
         Springfield, Massachusetts 01103
10       413-531-5004
         edward.pikula@outlook.com

11

12       LAW DEPARTMENT, CITY OF SPRINGFIELD
         By: Lisa C. DeSousa, Esq.
13       1600 East Columbus Avenue
         Springfield, Massachusetts 01103
14       413-886-5206
         ldesousa@springfieldcityhall.com

15

16

17

18

19

20

21

22            Proceedings recorded by sound recording and
               produced by computer-aided stenography.
23

24

25

<pre>
 1                    P R O C E E D I N G S

 2            (Recording begins at 11:18:06)

 3            THE CLERK:  In the matter of Savage, et al. versus

 4   City of Springfield, et al., Civil Action number 18-30164.

 5            THE COURT:  Okay.  So I have some things that I want

 6   to consider today, but I want to consider also, you know,

 7   issues that the parties want to raise with me.

 8            So why don't I -- let me start with you, Mr. Lizana.

 9   Anything sort of particular on your list that you want to make

10   sure that we address today?

11            MR. LIZANA:  Yes, Your Honor.  I wanted to address the

12   issue of the medical records.  I received your order.

13            THE COURT:  Yes.

14            MR. LIZANA:  And I certainly understand the letter,

15   and the spirit of it is that you believe that -- or Mr. Pikula

16   contends that during the depositions I told him that he could

17   not have the medical records because of the garden variety

18   damages.

19            THE COURT:  No.  I think what he said was you were

20   invoking confidentiality.  That's what he said, that you were

21   making claims regarding a variety of emotional distress and

22   that didn't waive the confidentiality as to records of

23   counseling.

24            MR. LIZANA:  Right, right.  And your orders say -- you

25   were, I guess, basing your assessment on his suggestion.  I
</pre>

10:25 (line 5)
10:26 (line 10)
10:26 (line 15)
10:27 (line 20)
10:27 (line 25)

1    would suggest that you actually look at the transcript to see

2    what happened.  I brought copies of it with me.  There was no

3    mention of anything about garden variety damages.  And I

4    specifically told Ed during the deposition that whatever you

10:27  5    need -- whatever I need to put forward, I want you to have to

6    substantiate emotional distress.

7         We had a brief off-the-record conversation where I

8    asked him to put in a formal request, and then we were back on

9    the record.

10:28 10    THE COURT:  Well, that's not really going to change my

11    ruling that the records should be provided, that the

12    confidentiality is waived at this point, Mr. Lizana.  If you --

13    if your clients -- if you're going to call the counselor to

14    testify, then the defense is entitled to -- then it's a waiver

10:28 15    of confidentiality as to the contents of the records and the

16    communications with the treating care provider.  That's just a

17    waiver of confidentiality.

18         MR. LIZANA:  Your Honor, I certainly understand that.

19    I was addressing, I think, the point you were making in your

10:28 20    order about -- and the one that Mr. Pikula argued as using

21    garden variety as both shield and sword.  We're not using it.

22    I told him we were open to providing those records --

23         THE COURT:  Sure.

24         MR. LIZANA:  -- with the proper request.  And in fact,

10:28 25    throughout the depositions, when we've needed information,

1    Mr. Pikula has said put it in a request, and that's exactly

2    what I did.  All I did was ask him to do the same thing.

3         So if your ruling is grounded on the idea that

4    asserting garden variety was a basis for us to turn over the

10:29    5    records, I just further wanted to address that point.

6         THE COURT:  Okay.  It's really the fact that once you

7    call the psychologist or the treating care provider with

8    respect to emotional distress, you're choosing to waive

9    confidentiality.  When there are a series of decisions issued

10:29   10    by Courts in this district that say, you know, you can maintain

11    confidentiality, we won't require the production of records.

12    But once the party chooses to rely on the testimony of the

13    treating care provider, that confidentiality is waived.

14         I heard from the City.  Regardless of what the nature

10:30   15    of the discussion was, I heard from -- I heard from the City

16    that the -- that Ms. Fuentes was identified as a witness

17    relatively late in the process, and so, as a matter of

18    fairness, to enable the City to cross-examine and given that by

19    calling the counselor, the treating care provider, as a

10:30   20    witness, you're waiving confidentiality -- your client's

21    confidentiality as to the communications with the care

22    provider.  I think that's pretty clearly set out in a number of

23    cases decided by Courts in this district.  Then the City is

24    entitled to have the records so it has a basis for

10:30   25    cross-examination.

         1          MR. LIZANA:  I understand.  I just wanted to address
         2   your point because I think it was based on a misrepresentation,
         3   and if your point is that that's irrelevant, I understand that.
         4          THE COURT:  At this point that is pretty much my
10:31    5   ruling, yes.
         6          MR. LIZANA:  Got it.
         7          THE COURT:  Yes.
         8          MR. LIZANA:  Well, I've -- I have a copy that I will
         9   turn over before we leave today.
10:31   10          THE COURT:  Okay.  Good.  All right.  Anything else
        11   that you wanted to address sort of off the top?
        12          MR. LIZANA:  I guess we'll get to this at some point,
        13   but I did submit to the Court a supplemental report from
        14   Dr. Erath.
10:31   15          THE COURT:  Yeah, that comes to my -- is that -- my
        16   understanding -- and I will put this out there.  My
        17   understanding at the time that I ruled that his testimony could
        18   come in was that you had already provided the supplemental
        19   report, that he had already done the calculations and that the
10:31   20   supplemental report had already been provided to the City.  And
        21   we are now in the Friday before -- you know, it's June 6th
        22   before a June 10th -- I'm probably getting the dates wrong.
        23   It's the 7th with a June 10th trial date, and this is the first
        24   time the City has seen these revised calculations by Dr. Erath;
10:32   25   is that correct?

|   | |
|---|---|
| 1 | MR. LIZANA:  It is.  But I never represented to the |
| 2 | Court, and I think Edward -- Mr. Pikula.  Sorry.  I didn't mean |
| 3 | to call you by the first name. |
| 4 | MR. PIKULA:  It's okay, brother. |
| 10:32 5 | MR. LIZANA:  He said it was forthcoming, and that's |
| 6 | what I told him, it was forthcoming. |
| 7 | THE COURT:  I guess -- I understood at the time that I |
| 8 | ruled that it would be coming into evidence, that it had |
| 9 | been -- the calculation had been done and the expert report |
| 10:32 10 | provided.  When would you plan on calling Dr. Erath? |
| 11 | MR. LIZANA:  On the -- on likely the 13th. |
| 12 | THE COURT:  On Thursday? |
| 13 | MR. LIZANA:  Yes. |
| 14 | THE COURT:  All right.  I'll think about that, and |
| 10:32 15 | I'll hear from the City on that. |
| 16 | Again, my understanding was that the -- and perhaps I |
| 17 | misunderstood, but I -- |
| 18 | MR. LIZANA:  I think you did, Your Honor. |
| 19 | THE COURT:  Well -- but I certainly took as a fact |
| 10:33 20 | that you had already given the City the revised statistical |
| 21 | evidence on the basis of which Dr. Erath was going to testify, |
| 22 | and I don't think the City has ever told me, no, we haven't |
| 23 | seen it yet.  That certainly would have perked up my ears.  So |
| 24 | I'm not blaming you.  But I can tell you that when I ruled that |
| 10:33 25 | his testimony would come in, my assumption was that the City |

|   | |
|---|---|
| 1 | had already seen it -- had already had it, had already had it. |
| 2 | MR. LIZANA:  Right. |
| 3 | THE COURT:  That it had already been prepared. |
| 4 | So, okay, anything else? |
| 10:33 5 | MR. LIZANA:  No, not at the moment. |
| 6 | THE COURT:  Okay.  Okay.  Mr. Pikula, things that are |
| 7 | at the top of the list?  The motion for reconsideration, I |
| 8 | suppose, is at the top of the list. |
| 9 | MR. PIKULA:  Yes, Your Honor.  As you know, Judge |
| 10:34 10 | Hodge issued a decision yesterday, and I put together a hasty |
| 11 | motion to get that in front of you and lay out our position. |
| 12 | And it's tied into this -- because, as of yesterday, when I was |
| 13 | drafting that in the afternoon, I did not have any report, |
| 14 | and -- correct me if I'm wrong, but my recollection is that |
| 10:34 15 | back on May 15th, when I was trying to figure out who we'd be |
| 16 | calling, I was told you had asked Mister -- Dr. Erath to do a |
| 17 | revised calculation, take out the -- |
| 18 | THE COURT:  The 22 people hired prior to -- |
| 19 | MR. PIKULA:  Prior to 1995 -- |
| 10:34 20 | THE COURT:  -- 1995. |
| 21 | MR. PIKULA:  -- but we were not going to get a new |
| 22 | report, and that is when I indicated I need to have a rebuttal |
| 23 | witness that I'm going to call.  Luckily I had somebody I was |
| 24 | consulting with, but I had to throw together -- |
| 10:35 25 | THE COURT:  Okay.  All right. |

1          MR. PIKULA:  -- based on that.

2          THE COURT:  Okay.  But the motion -- let's go back to

3     the motion for reconsideration.

4          MR. PIKULA:  Right.  So, as you know, the Judge issued

10:35  5     his decision.  Let me just start by saying, he never really

6     answers the question that is at issue here --

7          THE COURT:  Right.

8          MR. PIKULA:  -- which I think we were trying to get in

9     front of him and expecting him to answer --

10:35  10          THE COURT:  No.

11          MR. PIKULA:  -- and that was surprising.

12          THE COURT:  Disappointing?

13          MR. PIKULA:  No.  No, not at all.

14          THE COURT:  Okay.

10:35  15          MR. PIKULA:  I thought that the --

16          THE COURT:  The decision is fine.

17          MR. PIKULA:  Yeah.

18          THE COURT:  It's solid.

19          MR. PIKULA:  I thought it was a simple sort of

10:35  20     decision.  And he did, he took the easiest way to decide this.

21     But implied implicit in that decision is a lot of other stuff.

22          THE COURT:  Okay.  But let me just stop you for a

23     minute.

24          MR. PIKULA:  Yeah.

10:36  25          THE COURT:  I read it, you know, and, you know, I find

1    myself in the same position that I was in --

2         MR. PIKULA:  Right.

3         THE COURT:  -- when we were here before, which is to

4    say that Judge Hodge issued his ruling, and what he has said

10:36  5    now is what I issued in December of 2022, or whenever it was,

6    was a declaratory judgment that declared the parties' rights

7    and obligations under the residency ordinance.  And a

8    declaratory judgment doesn't give rise to any obligations that

9    are enforceable by a contempt order, and I'm not revisiting any

10:36 10   of the arguments, so it doesn't sort of substantially change

11   what's out there.

12         I still would like, just as a matter of -- so in other

13   words, it doesn't give the Court really a basis to reconsider

14   the rulings that it's already made with respect to how the case

10:36 15   can -- you know, how the Court could maybe still try this case

16   with this matter of law -- these matters of law very much up in

17   the air, notwithstanding the Court's view that they should have

18   been brought to the Court in the form of dispositive motions.

19         I mean, I -- you know, as a practical matter,

10:37 20   Mr. Lizana, I remain concerned, very concerned -- well, as a

21   practical matter -- let me -- I'll put this out there.  You

22   know, I -- I mean, sitting here, this is what I hear.  Your

23   clients worked for the, you know, the fire department for

24   years.  They worked their way up through -- you know, they

10:37 25   obtained promotions.  Each of them at some point hit a glass

ceiling that he thought should not have been there, and they

looked around and there were not a lot of other people of color

in the senior ranks of the fire department.  I think that's

why -- I think, from where I sit, that's why we're here.  Is

that mistaken?

MR. LIZANA:  No.

THE COURT:  Okay.

MR. LIZANA:  No.

THE COURT:  There remains the question about whether

the claims that are pending in front of this Court are really

viable and whether they're really going to able to vindicate

that concern that your clients have raised.  You know, as to --

and I guess I'm asking you to think about this from a practical

point of view; that's what I'm suggesting.

You know, as to Mr. Savage, he identified a 2014

opportunity where he lost a -- 2014 occasion when he lost a

promotional opportunity to Mr. Guyer, who had not complied with

the residency requirement and -- but Mr. Guyer was hired prior

to 1995, so there are two, you know -- you know, using that as

any kind of an anchoring as a basis for a claim here, there are

two real problems with it.

First, it's outside of the statute of limitations, and

the City preserved the defense of statute of limitations.  And

second, it's in conflict with Judge Hodge's decision, which

is -- which I have already said is binding or preclusive on

1    this Court, that the ordinance does not apply to people who

2    were hired prior to 1995, and Mr. Guyer was hired in 1987.

3         And so the residency ordinance -- he was properly on

4    the list.  There was -- it was -- you know, he was properly on

10:39  5    the list.  There cannot be a claim as a matter of law.  I think

6    as a matter of law there are two reasons why there can't be a

7    claim.

8         Then I come to -- so, as to Mr. Blake, there are some

9    promotional opportunities, applications identified in 2018.

10:39 10    But then I come to the basis -- the basis that I hear both

11    Mr. Blake and Mr. Savage asserting about other promotional

12    opportunities, and as I understand the basis -- and this would

13    really go to whether Mr. Savage really, you know, can really

14    raise -- can really raise any claim that won't be just, you

10:40 15    know, vulnerable as a matter of law.  If his claim that there

16    would have been other promotional opportunities depends on the

17    contention that had the residency ordinance been applied, the

18    employment of other members of the fire department would have

19    been terminated because they didn't comply with the residency

10:40 20    requirement.  I think that's 711(a) or (b), I don't remember

21    which.  Judge Hodge also struck that down as invalid.

22         That argument, if that's the basis of the contention

23    that there would have been other promotional opportunities

24    available, that is also not going to stand up to scrutiny as a

10:41 25    matter of law because Judge Hodge has said that the provision

          1   that required the termination of the employment of anybody who

          2   wasn't a resident or didn't become a resident within a year, he

          3   struck it down as invalid.  And so, if that's the basis for the

          4   claim that there would have been other promotional

10:41     5   opportunities involved, possibly on a timely basis, those

          6   claims also are really -- I mean, they're on such thin ice that

          7   I'm not sure there's ice there at all.

          8          You know, you're proposing to bring in an expert.

          9   There are costs to bringing in an expert.  I don't -- I don't

10:41    10   know what any arrangement is, and I'm not -- you know, I'm not

         11   going to ask about that.  But you know, whether -- just to

         12   think practically about whether or not these claims, if I am

         13   properly understanding their basis, whether there's really,

         14   again, anything that the Court could do as a matter of law to

10:42    15   give your clients -- really, whether they can identify any

         16   injury here that would be cognizable or whether those claims

         17   really are barred as a matter of law.  And I have a

         18   significant -- I mean, I have really significant concerns that

         19   they are.

10:42    20          And I don't need to hear argument.  I'm just, as a

         21   practical matter, suggesting that you think about that and talk

         22   about that with your clients.  It's a real concern.  It's a

         23   concern.  It does not, in my mind, in my view affect the

         24   hostile environment claims because I think your clients can

10:42    25   still testify that they had a good faith -- well, you know, as

1    to their complaints about the residency ordinance, that they

2    had a reasonable good-faith, you know, complaint.  For example,

3    the City Council or wherever else they made those complaints,

4    that they had a reasonable good-faith basis for believing that

10:43  5    the failure to enforce the residency ordinance, you know, had

6    disparate impact and perhaps was motivated by racial animus to

7    the extent that's required.  You know, I think their hostile

8    work environment claims don't -- you know, are not claims that

9    are in the same kind of jeopardy, let me put it that way.

10:43 10        And, you know, as to protected activity, like the

11   filing of the MCAD complaint, you know there's a difference

12   even between the protected activity where there's not even --

13   you know, as far as I can see in the First Circuit, there's not

14   even a requirement of good faith.  But in any event, I don't

10:43 15   think there's a lack of good faith here, so I'm not even going

16   to get here.

17        MR. LIZANA:  Right.

18        THE COURT:  So, you know, it seems to me that, you

19   know, your clients can identify protected activity, that they

10:43 20   can testify to good faith and reasonable belief, and so the

21   hostile environment claims are not in the same kind of jeopardy

22   that the failure to promote claims and the equal protection

23   claims are, but -- and the retaliation claims, I think it's the

24   same.  If you can tie them, you know, to pro -- if you can tie

10:44 25   an adverse employment, you know, event to protected activity

1    and it qualifies as an adverse employment event, you know, and

2    the Court has said that retaliatory hostile environment has

3    been recognized by the First Circuit as an adverse employment

4    event, you know, then, again, the retaliation claims are not on

10:44  5    the same kind of thin ice.

6         So -- but I just -- for purposes of discussion and for

7    what we're really going to put in front of a jury, I just would

8    like you, as a practical matter, to be thinking about what

9    really is likely to be productive for your clients and what

10:44 10   might result in costs that may not be well invested.

11        MR. LIZANA:  I hear you loud and clear, Your Honor.

12   If I might ask you to consider a practical issue.  Mr. Savage

13   and Blake have been trying to address this issue of

14   nonenforcement of residency going on eight years now.  And what

10:45 15   we're seeing without casting any aspersions --

16        THE COURT:  Aspersions, right.

17        MR. LIZANA:  -- are individuals in the city courts

18   that are unwilling to do, Your Honor.

19        THE COURT:  Okay.  As Courts we're constrained by the

10:45 20   law and by the definitions of claims and by statutes of

21   limitations.  We are constrained by those things.  We are

22   governed by those things.

23        MR. LIZANA:  You certainly are, you certainly are.

24   But I believe this would be the first time that the issue is

10:45 25   squarely before a judge on the discrimination aspect of it.

1           THE COURT:  I don't --

2           MR. LIZANA:  Yeah, I mean, the Superior Court didn't

3    want to deal with the discrimination issue because it has

4    nothing to do here and didn't want to hear anything about the

10:46  5    discrimination issue.  Save that for Federal Court.

6           THE COURT:  But you're still talking about disparate

7    impact --

8           MR. LIZANA:  Right.

9           THE COURT:  -- and equal protection, and I'm still

10:46 10    telling you that the interpretation -- again, I understand.  I

11    really understand what you're saying, and, you know, again, I

12    also think -- I can be wrong, I could be wrong, but I think I

13    know why we're here.  But I still -- and you know, it's

14    whatever you said, but I'm still, you know, constrained by the

10:46 15    interpretation of the ordinance, the requirements of state law,

16    and if -- you know, and perhaps, you know, a stubborn, unfair,

17    you know, union refusal to, you know, yield or bargain on a

18    residency requirement.  And I -- you know, again, I don't know

19    what the -- you know, again, what the background is or what,

10:46 20    you know, what the collective bargaining agreements have

21    applied, but the Court is still -- well, anyway, I mean, you

22    understand where we are?

23           MR. LIZANA:  Yeah, I understand that.

24           THE COURT:  We're not really talking about

10:47 25    cross-purposes but --

1          MR. LIZANA:  Right, right.

2          THE COURT:  I don't dispute what you're saying, but

3   you know, again, I am still constrained.

4          MR. LIZANA:  I understand, you're constrained by the

10:47  5   law, and as you mentioned the last time we were here, there's

6   law in this area.  This can be decided.  I understand your

7   caution is whether I really want to go here, but there --

8          THE COURT:  But the law is not favorable to your

9   clients.

10:47 10          MR. LIZANA:  We believe that it is.

11          THE COURT:  I don't think so.  Well, let me just put

12   it this way, you have to have clients who suffered an injury on

13   a timely basis, that's not speculative, and that does not

14   depend on or rely on provisions of that ordinance that Judge

10:47 15   Hodge has said are not valid.

16          MR. LIZANA:  Right, right.

17          THE COURT:  And I don't think we have that here.

18          MR. LIZANA:  Your Honor, when he said that the section

19   that would deny due process is invalid, he didn't invalidate

10:48 20   the whole section.  He said you cannot terminate someone

21   without due process.

22          THE COURT:  Right.  And so --

23          MR. LIZANA:  He didn't say you couldn't terminate them.

24          THE COURT:  Well, but he said that portion of the

10:48 25   statute is invalid is what he said.  Invalid is what he said.

1          MR. LIZANA:  All right.  But that's not what -- but if

2    you're saying I should have a conversation with my clients, I

3    will do that.  I will do that in light of what you've shared.

4    I just wanted to give you some of my thoughts on it.

10:49  5          THE COURT:  So what we said is these -- so 10(b) is

6    the section that applies.  To the extent permissible -- or I

7    think it's 10.

8          MR. LIZANA:  10(e).

9          THE COURT:  Well, in contrast to 10(a) -- I thought it

10:49 10    was 10(a).  10(b) -- 10(b) governs the civil service list.

11    10(a), "No collective bargaining agreement shall contain any

12    provision with respect to the residency of any person hired

13    after date of such contract be deemed to" -- where is it?

14    Section 10(b).  Oh, "Shall cease to be employed by the City and

10:50 15    the department head," and he held 10(b), "Upon receipt of the

16    certificate where it's not whether the employee is not a

17    resident of the city, the person" -- so that person -- "that

18    person shall cease to be employed by the City and the

19    department head or like officer shall give notice of his or her

10:50 20    action to the City Clerk and shall cease to be employed by the

21    City," he held that to be invalid --

22          MR. LIZANA:  So --

23          THE COURT:  -- and unenforceable.

24          MR. LIZANA:  So by your reading of it, if you are

10:50 25    correct -- I disagree, but I am not saying that your argument

1    doesn't have some --

2           THE COURT:  I'm not arguing.  I'm reading Judge

3    Hodge's decision, but anyway, my interpretation.

4           MR. LIZANA:  Right.  He said the problem with it is it

10:50  5    didn't provide due process, and I think, up until this point,

6    everyone has their idea that it requires due process to

7    terminate someone, which I don't think it was ever really an

8    issue.  No one argued that you could do it without due process.

9    But by your reading this --

10:51  10           THE COURT:  Again, I'm not -- I'm not -- I don't have

11    the -- you know, I don't have the issue fully briefed and

12    argued in front of me.

13           MR. LIZANA:  Right.

14           THE COURT:  I, again, think that, you know, between

10:51  15    Judge Hodge's decision and the, you know, the *City of Lee* --

16    the *City of Lee* decision and whatever is in the collective

17    bargaining agreements, again, these claims are on, you know,

18    thin ice to the point of vanishing, that's all.  That's all I'm

19    saying.  As a practical matter, I'm asking the parties -- I'm

10:51  20    really asking the parties to think about that.

21           I know that doesn't solve an issue that your clients

22    have very much taken to heart for reasons that I think are, you

23    know, sort of supported by the statistics that Dr. Erath has

24    supplied, you know, that the members that -- you know, that

10:52  25    particularly for a fire department that's operated under a --

1   that operated under a consent decree from the beginning of 1974

2   with an obligation to give at least some preference to

3   employees of color, there must have been a pool of people who

4   would have been, you know, a pool of employees of color who

10:52  5   would have been eligible, qualified for promotion and that

6   they're not represented in the senior ranks, you know, of the

7   fire department.  I get that they have, you know, a commitment

8   and a belief that that's just not right, which should not be

9   the case.  I get that.

10:52  10   And again, what I see on the papers is that I am very

11   much constrained in terms of the ability -- I may be very --

12   I'm likely to be very much constrained in the ability to

13   provide a remedy.  That's all I'm saying.

14   MR. LIZANA:  Your Honor, I believe that you're not

10:53  15   constrained on it consistent with already this and dispositive

16   motions and referred to it in our initial complaint, is that

17   even the act of grandfathering itself had a disparate impact

18   that is squarely in need of protection issue, this Court

19   doesn't need to defer anyone to sign.  And the bottom line is

10:53  20   when you change the rules in the middle of the game, instead of

21   everyone who's in violation prior to this new day are

22   exonerated, the folks who have followed the rules up to the new

23   day are harmed.  They include African Americans and Hispanics.

24   This is Springfield --

10:53  25   THE COURT:  But, again, your clients -- I mean, again,

1    I'm not generally -- it's not a class action.  I need your

2    clients, I need your --

3            MR. LIZANA:  They are in that category.

4            THE COURT:  No, no.  Again, we don't have statistics

10:54  5    on that.  We don't have statistics on that separate from, you

6    know, a statistic going back to the beginning.  We wouldn't

7    have testimony on that.  You can't really change the theory of

8    the case the Friday before, you know, the Friday before the

9    case goes to trial and say we should look at this through a

10:54 10    different lens.

11            MR. LIZANA:  Your Honor, it's consistent with our

12    argument.

13            THE COURT:  But it's not supported -- you know, what

14    are the numbers, how does that play out, what -- you know,

10:54 15    again, I don't think there's -- other than speculative

16    evidence -- speculative testimony from your clients, I don't

17    see what evidence there is that would support that particular

18    point.

19            MR. LIZANA:  I think Dr. Erath's reports certainly

10:54 20    show that whites were disproportionately advantaged by the

21    position, and it's easy to see that --

22            THE COURT:  Okay.  I'm not -- again, I'm not deciding

23    this issue now.  I'm just suggesting that you think really

24    carefully with your clients about whether we're really going to

10:55 25    be able to -- you know, what's really going to happen even if

         1   we present this case to a jury and then, you know, if a jury

         2   comes back in your clients' favor, what's going to happen after

         3   the fact.

         4        MR. LIZANA:  Right.

10:55    5        THE COURT:  Because I think, again, I think there are

         6   serious questions.

         7        MR. LIZANA:  I've heard you, Your Honor.

         8        THE COURT:  Okay.

         9        MR. LIZANA:  And will adhere to your experience.

10:55   10        THE COURT:  Okay.

        11        MR. PIKULA:  If I may, Your Honor.

        12        THE COURT:  But, again, I'm not -- I don't have -- I

        13   never got the motion.

        14        MR. PIKULA:  No.  Two points on this issue with

10:55   15   Dr. Erath.  Number one, what he just mentioned now is precisely

        16   what Erath is relying on, and I would draw your attention to

        17   paragraph 11 where he says, "Impact of grandfathering."  "I

        18   have been advised of the City's position that in collective

        19   bargaining agreements that went into effect July 17th, 2017,

10:56   20   firefighters and lieutenants, February 1, 2018, captains

        21   eligible for promotion to district chief, the residency

        22   requirements were eliminated," that's not true.

        23        That is -- and then this, worse than that, and this

        24   goes directly to what he's saying; that is, "Everyone employed

10:56   25   prior to those dates was deemed to satisfy the requirements,"

```
 1   no.  And that is the argument he's making now, and that is
 2   changing the horses in midstream that was never part of this
 3   case, that is now the basis of his new opinions.  That is
 4   why -- and definitely this shouldn't come in and his new
 5   opinion shouldn't come in because that goes to the heart of it.
 6           And in particular, Your Honor, you can see how that
 7   hinges on this legal issue involving this ordinance versus
 8   collective bargaining agreements.  And you can see that
 9   Dr. Erath signed this yesterday, June 6th.  And as I said, I
10   didn't even have it until 10:30 last night, and I have been
11   asking for this when I learned that he was doing it for the
12   first time.  So this entire new theory should --
13           THE COURT:  So this really is -- this really -- this
14   is not the same.
15           MR. PIKULA:  Correct.
16           THE COURT:  We look at -- yeah.  All right.
17           MR. PIKULA:  So --
18           THE COURT:  But the change was still a function --
19   whatever change did happen in 2017 and 2018 was still a
20   function of a collective bargaining agreement?
21           MR. PIKULA:  Correct.
22           THE COURT:  And you would still say that that would --
23           MR. PIKULA:  And that it supersedes anything in the
24   ordinance.
25           THE COURT:  Anything in the ordinance, in any event.
```

<table>
<tr><td>1</td><td>MR. PIKULA:  Correct.</td></tr>
</table>

1            MR. PIKULA:  Correct.

2            THE COURT:  Yes.  Okay.

3            MR. PIKULA:  So I -- and the last point on that is,

4       even though Judge Hodge didn't decide it, it's sort of cleared

10:58  5       a path for this Court to resolve it as it applies here.  I

6       don't know how much broader it goes, but as to -- and then,

7       again, Judge Hodge was very narrow in how he decided it.  And

8       that's all he decided, what he felt he had to decide, but

9       decided what was in front of him.

10:58  10            And -- but now that we're here and we've got that

11       case, there's no question I'm aware of where I was like is this

12       something that I bring to the federal court even though it's

13       pending in state court.  Will that be going to be referred to

14       state court and will the state court say it's pending in

10:59  15       Superior Court.  And it just left such a quandary that I wasn't

16       sure what to do.  That path is cleared based on the decision

17       even though it's not decided.

18            THE COURT:  Meaning it's in front of me?

19            MR. PIKULA:  Correct.

10:59  20            THE COURT:  I agree, but I still don't have a

21       dispositive motion and I still have a trial date on Monday.

22            MR. PIKULA:  Understood, understood.

23            Now, I would like to also -- the other exhibit,

24       there's a chart that he's prepared which appears to be a

10:59  25       backpay calculation.

           1              THE COURT:  Dr. Erath?

           2              MR. PIKULA:  No.  That was submitted to me last night

           3     at around 10:30.

           4              THE COURT:  Oh, I haven't seen this.

10:59      5              MR. PIKULA:  And I woke up this morning -- may I?

           6              MR. LIZANA:  Yes, you may.  I actually sent it to you

           7     on May 15th.

           8              MR. PIKULA:  That was the original time I saw this,

           9     and the last -- and I want to put this in evidence.

11:00     10              MR. LIZANA:  Right.  I was sending it as a reminder to

          11     you that I already sent it to you.

          12              MR. PIKULA:  Yeah.  May I approach?

          13              THE COURT:  Okay.

          14              MR. PIKULA:  The document is a revision supplied to me

11:01     15     on May 15th of an earlier document that was part of our

          16     settlement negotiations, and the premise of that was in the

          17     absolute maximum what do you think --

          18              THE COURT:  Best-case scenario.

          19              MR. PIKULA:  -- you have.  And it says, well, let's go

11:01     20     back to the statute of limitations, and it assumes they should

          21     have been promoted by then, what would the damages be.  It has

          22     nothing to do with the case because you need to show a date of

          23     a promotion that you didn't get.

          24              THE COURT:  An opportunity.

11:02     25              MR. PIKULA:  And then how it's linked to it and

causally related.  That is not what's represented on there.

What's represented is a hypothetical, what's the maximum,

assuming that somehow you would have been promoted prior to the

statute of limitations.  And that was the basis of -- we went

11:02  to Judge Neiman three times trying to mediate this, and that

came out of our negotiations in the last mediation.  I would

suggest that it is not admissible.

            THE COURT:  Oh, it's not admissible.

            MR. PIKULA:  All right.  That's my point.

11:02  THE COURT:  Yeah, I'm not admitting this as a

document, Mr. Lizana.

            MR. LIZANA:  I didn't ask you or suggest to him that

it was going to be admitted as an exhibit, but I will use it to

question the witnesses because they worked on it.  And

11:02  therefore --

            THE COURT:  Subject to an objection as to testimony

about -- well, anyway.  I'll have to see how that comes out at

trial.

            MR. PIKULA:  I'm not -- what witnesses worked on it?

11:03  THE COURT:  Mr. Blake and Mr. Savage is what he's

saying, that they calculated --

            MR. PIKULA:  Me and you.  They didn't do any

calculations.

            MR. LIZANA:  How do you know anyone on our side did

11:03  it?

1          MR. PIKULA:  Again, it's settlement negotiations that

2     were being discussed, and it was a document put together as

3     part of that --

4          THE COURT:  Sure.

11:03  5          MR. PIKULA:  -- and it should not be admissible in

6     this case.

7          THE COURT:  I do not think that I would admit this

8     chalk.  Again, I, you know, I've said that I think that, you

9     know, that the plaintiffs don't -- you know, aren't required to

11:03 10   present expert testimony in support of their economic damages,

11    that to the extent I found authority on that, I thought that

12    was, you know, supported, you know, subject to challenges to

13    admissibility about testimony, about promotional opportunities,

14    whatever that testimony is at trial.

11:03 15          MR. PIKULA:  All right.  Well --

16          THE COURT:  So that's the motion for reconsideration.

17    I mean, again, I have, you know, sort of -- I don't have a

18    vehicle for ruling on this.  You know, it seems to me that this

19    chart even -- well, anyway, is not necessarily consistent with

11:04 20   what Mr. Lizana is now arguing about promotional opportunities,

21    but anyway.  Anyway, yes.  So I, again, still don't have a

22    vehicle for saying that this -- you know, I can't rule on the

23    motion in limine.  I don't believe that it's appropriate for

24    the Court to rule on a motion in limine that these, you know,

11:04 25   some of this evidence should not come in, although I have -- I

1    will consider further that if this is really a revised, a

2    completely sort of different theory, that to introduce a

3    different theory through an expert on the last, you know, the

4    Friday before a Monday trial really is not something that the

11:05 5    Court can fairly permit.

6            MR. PIKULA:  And one last thing, I believe -- I know

7    there is no vehicle in front of you.  I am more than willing to

8    brief this issue for summary judgment purposes or motion to

9    dismiss or -- I mean, it definitely will be briefed for

11:05 10    directed verdict, but I'm happy to do that now.

11            THE COURT:  Yeah, but when would the Court decide it

12    with the jury coming in on Monday?

13            MR. PIKULA:  I totally understand that, Your Honor.

14    And I don't want to delay the trial --

11:05 15            THE COURT:  No.

16            MR. PIKULA:  -- but --

17            THE COURT:  I can't -- again, we set this trial twice.

18    We delayed it partly -- you know, we delayed it because people

19    had medical issues.

11:05 20            MR. PIKULA:  Yes.

21            THE COURT:  And so that's, you know --

22            MR. PIKULA:  And I understand that.

23            THE COURT:  You know, I have sort of said, okay, look,

24    I think I can try this case this way, but I have told

11:05 25    Mr. Lizana that I have grave reservations about whether there's

1    any ice at all underneath his clients' claims on the equal

2    protection and on the --

3              MR. PIKULA:  Yes.

4              THE COURT:  On the --

11:06  5        MR. PIKULA:  Disparate impact.

6              THE COURT:  -- the disparate impact.  And it's not

7    clear to me that if Dr. Erath's new report really changes the

8    theory on disparate impact, that it's appropriate to admit that

9    testimony on -- when it's only turned over in that form on the

11:06 10   Friday before a Monday trial.

11             MR. PIKULA:  The only other issues, other than the

12   jury instructions or voir dire, that I have, and it's an issue

13   I don't really want to bring to your attention, but I -- before

14   we leave here today -- I'm glad of the records, that was one of

11:06 15   my questions; I guess I'm going to get those.  But the other

16   question is who are the witnesses going to be for Monday so

17   that I can have some preparation.

18             THE COURT:  Yeah.

19             MR. PIKULA:  Before we leave here today, I would like

11:06 20   to know.

21             MR. LIZANA:  (Inaudible)

22             THE COURT:  Sure.  Yes.

23             MR. LIZANA:  So for Monday -- what time are we

24   starting?

11:07 25             THE COURT:  Well, we're going to pick a jury.

|      |    |                                                                              |
|------|----|------------------------------------------------------------------------------|
|      | 1  | MR. LIZANA:  Right.                                                           |
|      | 2  | THE COURT:  That could take --                                               |
|      | 3  | MR. LIZANA:  That could take --                                              |
|      | 4  | THE COURT:  Possibly it could take the day, but it                           |
| 11:07| 5  | might not.                                                                    |
|      | 6  | MR. LIZANA:  It could take the day, all right.                               |
|      | 7  | THE COURT:  We have a court reporter from 9:00 to 3:30                        |
|      | 8  | next week.                                                                    |
|      | 9  | MR. PIKULA:  So we'll be going --                                            |
| 11:07| 10 | THE COURT:  We can go in the afternoon.  I'm sorry.                           |
|      | 11 | Yes, we can.  We do have a court reporter from 2:00 to 3:30 in               |
|      | 12 | the afternoons next week.                                                     |
|      | 13 | MR. LIZANA:  All right.  So it's from 9:00 to 1:00 and                        |
|      | 14 | then 2:00 to 3:30.                                                            |
| 11:07| 15 | THE COURT:  2:00 to 3:30, yes.  I don't know yet about                        |
|      | 16 | the week after that except that, again, still the 19th and the               |
|      | 17 | 21st are not -- we won't be -- you know, we won't be in                       |
|      | 18 | session.                                                                      |
|      | 19 | I guess I really -- okay.  Well, before we -- I'm                             |
| 11:08| 20 | just -- I am concerned that this is a real change in the                      |
|      | 21 | presentation of the opinion evidence from Dr. Erath that the                  |
|      | 22 | City really hasn't seen until today, Mr. Lizana.  I didn't                    |
|      | 23 | understand that it really changed -- sort of changed the theory              |
|      | 24 | in the way that it does.  Well, I will have to look at that and               |
| 11:08| 25 | see.  I think it does.                                                        |

1          MR. LIZANA:  Your Honor, I would encourage you to look

2     at the two dispositive motions that you decided in this case

3     that helped us to narrow some of the issues, it was argued both

4     times.

11:08  5          THE COURT:  No, no.  I never -- no, Dr. Erath's

6     statistics, were they -- were they premised on -- I understand

7     that the collective bargaining agreement business was argued,

8     but were the statistics premised on the 2017 and 2018 decisions

9     that changed the status --

11:09 10          MR. LIZANA:  Yes.  So the --

11          THE COURT:  -- or not?  I don't remember that being

12     part of his report.

13          MR. LIZANA:  Right.  Well, some of it he's responding

14     to their criticisms.

11:09 15          THE COURT:  Well, no.  Okay.  But it's a new theory,

16     really.  If he's changing his analysis of the statistics on,

17     you know, the impact of failure to enforce the residency

18     requirement based on the grandfathering and he didn't

19     previously do that, that's a pretty significant change in what

11:09 20     he's prepared to testify to.  I haven't read it.  I can't sit

21     here and offer any view on it.  I can't.  I do not know.  I

22     don't know.  I don't know.  But I am concerned that if this is

23     really a different theory, that's a problem.  I'll let you know

24     before Thursday.

11:09 25          But I also -- again, it doesn't change the fundamental

1    issues that the Court has identified with respect to these

2    claims, and they are real and fundamental.  All right.

3         MR. LIZANA:  Then I think there's still some motions

4    in limine that haven't been ruled on or maybe I don't know if

11:10  5    you intend to --

6         THE COURT:  So there is the -- the plaintiffs' motion

7    with respect to the First Amendment defense as to the social

8    media postings or the hostile work environment.  In essence --

9    I can't remember quite how it's phrased, but it's to preclude

11:10  10    the City from advancing a First Amendment defense.  In essence,

11    I'm going to deny the motion without prejudice and see how the

12    evidence comes in at trial on that.  But you will get something

13    written about -- on that subject.  I have prepared a memo on

14    that.  We're in the process of preparing a memo that I think

11:11  15    we'll be able to issue by the close of business today.

16         I've reviewed the civil service decision as to --

17    remind me of the name of the employee -- Mr. Mitchell, Jeris

18    Mitchell.

19         MR. LIZANA:  Jeris Mitchell.

11:11  20         THE COURT:  Jeris or Jeris?

21         MR. LIZANA:  Jeris.

22         THE COURT:  Jeris Mitchell.  I on balance thought that

23    Mr. Mitchell would -- I on balance think that Mr. Mitchell's

24    testimony should be admissible.  In essence, what the Civil

11:11  25    Service said is this was an applicant, a person of color who

was not given the same information that other employees were
given on how to establish residency, that Mr. Conant was a
decision-maker with respect to who should be hired at that
time, although he may have relied on -- you know, and this
would be a question of fact or a matter of testimony, but he
may have relied on information or assistance from somebody
else.

        But nonetheless, he is the decision-maker, and he is
someone who made statements, while Mr. Savage and Mr. Blake
were employed, about the enforcement of the residency ordinance
or a residency requirement and here confronted with what
someone, who I understand to be an African American applicant,
28th on the list, other people, at least according to the Civil
Service decision, were given different information on how to
establish residency.  Had he been given the appropriate
information, he would have been able to establish residency.
He would have been able to show that he was living with his
mother.

        I am not prepared to exclude that testimony.  I'm not.
Just as you have asked to exclude the opinions, the MCAD
written decisions, I'm not likely to admit the written decision
by the Civil Service, but I'm not prepared to exclude testimony
from Mr. Mitchell, if that's his name, about what happened when
he was an applicant.

        I don't think it shows disparate treatment with

respect to residency so much as it may have a bearing on, you

know, racial -- potential racial discrimination.  I'm not sure

quite how it shows disparate treatment when you just have, you

know, an individual in these circumstances, but I do think it's

11:13  relevant.  You have the same decision-maker, you have somebody

who has said, you know, I'm not in favor of enforcing

residency, and then when you have an African American applicant

in front of him who could in fact satisfy whatever residency

obligation applied to him at that point in time, wasn't given

11:13  the information to do that.  He's not similarly situated to

your clients.  Your clients are very differently situated.  So

it's difficult for me to see how that really sort of comes in

as proof of different treatment in a different way that would

have harmed your clients.  I think it comes in for other

11:14  reasons, Mr. Lizana; is that pretty clear?

MR. LIZANA:  I think so.  I think you've captured our

argument here of disparate enforcement.

THE COURT:  To some extent, but I don't see that we

have statistics overall that says disparate enforcement, you

11:14  know, that you can show sort of --

MR. LIZANA:  Right.

THE COURT:  You don't have statistical evidence to

show disparate enforcement.  In other words, you don't have

evidence to show that employees who -- that employees of color

11:14  who lived outside of the city were disproportionately impacted,

1    that their employment was terminated or affected or their

2    promotions were affected, you know, that the residency

3    ordinance was applied to them in ways that it was not applied

4    to individuals who were white or Caucasian.

11:14  5         But you have an incident where Mr. Conant is part of

6    the decision-making process and at least, according to the

7    Civil Service, the employee wasn't provided with the

8    information he needed.  An African American employee wasn't

9    provided with the information he needed to satisfy the very

11:15  10   simple requirement that he could have satisfied very easily.

11   So again, I'm not going to admit the decision, but I will admit

12   his testimony about what happened.

13        MR. PIKULA:  On that same motion was the how to deal

14   with the Facebook posts themselves.  There was the summary.

11:15  15        THE COURT:  Yeah, I said that summary, that --

16        MR. PIKULA:  Had to be redacted.

17        THE COURT:  -- column has to be redacted, yes.

18        MR. PIKULA:  But I'm just not sure, are all the other

19   posts coming in?  And, again, I think there's going to be

11:15  20   foundational issues there as to who -- where they came from,

21   who wrote them, and how do we do that without people saying,

22   yeah, I posted that and --

23        THE COURT:  Well, I mean, I think his clients can say

24   we went -- you know, we looked at this.  Did they print them

11:16  25   out at the time, Mr. Lizana?

```
 1              MR. LIZANA:  Yeah.

 2              THE COURT:  To the extent those -- will they be able

 3    to lay a foundation for saying, I saw this at a certain point

 4    in time?

 5              MR. LIZANA:  Right, they will.  And that's why I think

 6    the chart is helpful because I guess the opinion --

 7              THE COURT:  The descriptors.

 8              MR. LIZANA:  Right.  Then you get down to who posted

 9    it and what time it was posted.

10              THE COURT:  How do they know who posted it?  Is it

11    apparent from the face of the post?

12              MR. LIZANA:  Yes.  Some of the posts -- most of the

13    posts have a time stamp on them.

14              THE COURT:  Okay.

15              MR. LIZANA:  You can see exactly when it was posted,

16    and you can see who posted it.

17              THE COURT:  And you can see who posted it?

18              MR. LIZANA:  Right, right.  So if someone posts

19    themselves are self-authenticating, but our witnesses are

20    prepared to discuss exactly how they became aware of them, when

21    they became aware of them, how they were impacted by them.

22              THE COURT:  Yeah.  I mean, it's not like this -- I

23    understood -- again, I don't have any kind of -- you know, I

24    don't have any dispositive motion in front of me that says the

25    posts, you know, this does or this doesn't rise to the level of
```

|         |    | a hostile work environment.  I think there are -- you know,  |
|---|---|---|

a hostile work environment.  I think there are -- you know,

there are questions again, and I've sort of looked at the case

law.  But go ahead.  I'm sorry, Mr. Pikula.  I'm interrupting

you.  I'm sorry.

11:17    MR. PIKULA:  This is a lot more complicated than

explained because part of their case is that people were

posting things under their name.

THE COURT:  Oh, under the names of the plaintiffs?

MR. PIKULA:  Yes.  And also under pseudonyms.

11:20    THE COURT:  Yes.

MR. PIKULA:  And part of the claim is you failed to

investigate to find out who was that pseudonym.

THE COURT:  Sure.

MR. PIKULA:  But now we're going to have all of these

11:20    posts that purportedly are by the person, whoever is named

there, and that's an underlying issue as to the foundation of

these documents that he's offering.

THE COURT:  But -- well, he's got to prove -- you

know, to the extent that -- but there's no question that the

11:20    posts were made to this Facebook account -- and the City

conducted an investigation, I think, right?

MR. PIKULA:  There's no question we investigated it.

THE COURT:  But there's no question that the posts

were made?

11:21    MR. PIKULA:  Somebody made, by somebody.

1                THE COURT:  No, I understand that.

2                MR. PIKULA:  There is a question about who made them.

3                THE COURT:  I understand that, too.  But, you know,

4      there are -- there are certainly -- you know, the cases that

11:21  5      you cited about graffiti, you don't necessarily know who the

6      author of the --

7                MR. PIKULA:  Exactly.  That's why I think they are a

8      good comparison.

9                THE COURT:  But wait a second.  But these are not

11:21  10     claims based on graffiti alone.  Mr. Lizana is also saying that

11     comments or statements by supervisors contributed to the

12     hostile work environment by Mr. Calvi, I think, and Mr. Conant.

13     And the posts are part of the hostile work environment that his

14     clients experienced.  And so we're not relying on -- but my

11:21  15     point with respect to the graffiti cases is you don't know who

16     the author of the graffiti is any more than you know who the

17     authors of the Facebook posts are.

18                MR. PIKULA:  No.  Exactly.

19                THE COURT:  So it doesn't mean that they're not

11:22  20     admissible --

21                MR. PIKULA:  Right.

22                THE COURT:  -- if we know when they were posted.  And

23     there are some posts that are within the, you know, are timely,

24     within the statute of limitations, and we know that the hostile

11:22  25     work environment isn't subject to the same cutoff dates.  A

hostile work environment claim is cumulative, it's not subject
to the same cutoff statute of limitations issues that arise
with respect to an identifiable adverse employment action.

There are -- you know, there are questions about an
employer's -- the extent of an employer's liability, when it's
a coworker versus a supervisor, and the burden of proof is
always with the plaintiff, you know, and -- so that's, I
think -- that's my thought on how --

MR. PIKULA:  Okay.

THE COURT:  -- we deal with that.  Is that a sensible
approach?  Do you understand?

MR. PIKULA:  I understand what you're saying, and I'll
deal with it --

THE COURT:  Yes, yes.

MR. PIKULA:  -- now.

THE COURT:  So that's my thought about the social
media chart.

Yeah, and I think the chart itself -- so let me just
make sure, though.  You're saying, Mr. Lizana, the posts
themselves, do some of those posts purport falsely to have been
posted by Mr. Savage or Mr. Blake?  In other words, is the
author of the post, where does that information come from?  How
verifiable is that?  Does it appear from the face of the post
or is it different from the face of the post?  It just needs to
be -- even if your clients are going to say I would never, I

1  did not, I never would have, somebody did it, you know, it

2  just --

3          MR. LIZANA:  Right.

4          THE COURT:  -- the column has to accurately reflect

11:25  5  the purported author, that's all I'm saying, if it doesn't.

6          MR. LIZANA:  Right.  So the column that describes the

7  post.  And I mean, just sort of statistical data on the post,

8  the time that it was posted.

9          THE COURT:  You understand nobody has -- I haven't

11:25 10  seen the posts?

11         MR. LIZANA:  You haven't seen these, Your Honor?

12         THE COURT:  And I don't -- I don't -- I have other

13  things to do.  I'm sorry.

14         MR. LIZANA:  I'm not suggesting you don't.

11:25 15         THE COURT:  But no, nobody has submitted them.  I'm

16  sorry.  I'm looking for the chart, and I may not have brought

17  it upstairs with me.  But anyway, I'm just raising -- all I'm

18  raising is even if you subsequently learned that a particular

19  post is made by somebody, if the face of the post doesn't

11:25 20  reflect that, I don't think it can be -- in other words, the

21  chart should be consistent with the exhibits; that's all I'm

22  saying.

23         MR. PIKULA:  Yes, exactly, Your Honor.

24         MR. LIZANA:  And then the issue about -- I think there

11:25 25  was maybe one post, and I'm not even sure it's on the chart,

 1    where there was a firefighter who pretended to be Randy Blake

 2    and the City investigated and realized that it was a fake post.

 3            THE COURT:  Sure.

 4            MR. LIZANA:  I don't think that's on there.

11:26 5            THE COURT:  Oh, okay.  You think that only happened

 6    once, and that that's not on the chart?

 7            MR. LIZANA:  No, that's not on there.  Everything else

 8    you can see, for example, you know, Joseph Santamaria,

 9    supervisor.  And obviously it doesn't say on the post that he's

11:26 10   a supervisor, but we know he is, right?  I don't think that

 11    they dispute the time that it was posted.  And then the

 12    (inaudible).

 13            THE COURT:  Okay.  Well, the case law says he's a

 14    supervisor only insofar as he was a supervisor of your clients.

11:26 15   *Noviello* says that.  *Noviello* says that it's harassment by a

 16    coworker unless the individual, even if he or she held

 17    supervisory responsibilities in some capacity, did not hold

 18    supervisory responsibility over the plaintiff.  So it treats

 19    those people as coworkers as opposed to supervisors, but it

11:27 20   doesn't eliminate them from -- it's still -- they're still

 21    hostile -- you know, they still contribute to the hostile work

 22    environment.

 23            It does have a difference with respect to the

 24    standard.  So they are -- the parties have to be prepared to

11:27 25   deal with that from an evidentiary point of view.

          1          MR. LIZANA:  Right.  And there were some coworker

          2    postings, so.  But I understand your point, the term of

          3    supervisors are held to a higher standard.

          4          THE COURT:  Well, *Noviello*, which is a First Circuit

11:27     5    case, specifically talks about supervisors who are not

          6    supervisors of the plaintiffs are coworkers for purposes of the

          7    liability.  You know, whether they are treated as coworkers,

          8    and, you know, with respect to whatever defenses the employer

          9    may have.  *Noviello* just says that.  So it's the law in the

11:27    10    First Circuit.  I'm bound.

         11          MR. PIKULA:  The last item I had was in terms of

         12    Attorney Talia Gee and the conflict issue.

         13          THE COURT:  Yes.

         14          MR. PIKULA:  So the Court had asked me to submit --

11:28    15          THE COURT:  Yeah, I did.  I started to read it.  But I

         16    have not had time to read all of that.  And again, my ruling on

         17    that is just that the Court is going to deal with objections to

         18    questions.  You know, I can't tell out of context what would be

         19    an appropriate or inappropriate question, and that testimony or

11:28    20    that evidence will come in subject to objections and whatever

         21    argument counsel wants to make at the point, you know, at the

         22    point at which we get -- when we get there.

         23          It's sort of like the defenses.  To me the defenses

         24    to -- the employer defenses to the hostile work environment,

11:28    25    until the Court sees the factual context, I can't rule.  I

1    can't rule.

2              MR. PIKULA:  All right.

3              THE COURT:  So, although, again, I'm providing some

4    guidance, as much guidance, legal guidance as I think I can in

11:28  5    advance.

6              Okay.  So I think the other two sort of outstanding --

7    you know, I don't know whether I've actually -- and I probably

8    have not addressed in writing Mr. Lizana's fourth motion in

9    limine, which was to exclude the finding of contempt.  And I

11:29  10   can't see why that would come in as evidence, and I think

11   Mr. Pikula -- so, okay.

12             The third was to exclude the MCAD decisions, the MCAD

13   findings.  So my very capable intern -- I'm happy to find she's

14   very capable.  This was one of the first assignments I gave

11:29  15   her, but anyway, it appears that whether or not to admit

16   findings, it's within those kinds of findings, this would apply

17   to the Civil Service decision as to Mr. Mitchell, if I'm

18   getting his name right, Jeris Mitchell, and also as to the MCAD

19   findings as to your clients.  It's -- you know, they are an

11:29  20   exception to the hearsay rule because they are reports or, you

21   know, reports of investigations conducted by organizations that

22   exist for purposes of conducting these investigations.  The

23   case law says whether or not to admit or exclude them is very

24   much within the discretion of the Court.

11:30  25             My view is that I don't really want to invade the

province of the jury with -- but it doesn't preclude questions
based on the contents of the decisions.  You know, so those,
you know, and I think that that's pretty much what you said,
Mr. Pikula, in your response.

11:30    MR. PIKULA:  Yes.

THE COURT:  You weren't necessarily advocating that
the documents themselves would come into evidence even though
they are -- they are potentially exceptions to the hearsay
doctrine, and that's in part my same view with respect to the
11:30 Civil Service decision as to Mr. Mitchell, that the events, the
facts, even questions based on the contents, those can be
asked, but the documents themselves, my view is that I'm
unlikely on almost -- I'm very unlikely to admit those into
evidence.  In the exercise of discretion, I would tend not to.

11:31    MR. PIKULA:  And I think all that's left is I need to
know Monday's witnesses.

THE COURT:  Well, we still have to deal with -- I
haven't -- we haven't seen exhibits, Ms. Rivera hasn't seen
exhibits.  We haven't seen -- we don't know -- you know, I'm
11:31 also -- I still don't think I have a joint list of witnesses
that I can really rely on to read to the jury.  I did, after we
went through that list, come up with one other name that I
wanted to ask you about, Mr. Pikula, because it was at the very
bottom of page 26 of document 223, and it was Adelai
11:31 Mertilien-Cornet.  It seemed to me that she fell into the same

1    category as the other people to whom you had objected as

2    identified too late, but I don't think we discussed her.

3         MR. PIKULA:  She's someone who had been fired as

4    the -- under the residency.

11:32   5         THE COURT:  Okay.  Yeah, again, if they're not

6    similarly situated to your clients, I'm not -- again, they were

7    late.  I basically said they were identified late,

8    Mister -- you know, and not timely identified.  But I need a

9    list of witnesses that I can read to the jury so that the

11:32  10    jurors -- we can ask the jurors whether they know any of these

11    people because we might have to disqualify them if they do.  So

12    I need a joint witness list, and we still -- you know,

13    Ms. Rivera needs copies of exhibits so that she can -- you

14    know, we have a sense, the ones that are agreed to and then the

11:32  15    ones, you know, that are objected to.

16         I mean, again, I don't know what that list is, and we

17    don't have it on the Friday before a Monday trial.  You know,

18    again, as I looked at your proposed exhibit list, Mr. Lizana, I

19    had significant doubts about a lot of it, about whether or not

11:33  20    it was really likely to be admissible.  Much of it looked to me

21    like it would be objectionable on the grounds of hearsay.  But,

22    again, I didn't -- I didn't really try to analyze all of that.

23         I would like to know what do we agree on, what do we

24    disagree on.  And then, you know, we'll deal with objections as

11:33  25    there are attempts to introduce particular documents.  I do

1      think that -- so anyway, I'm not going to say any more than

2      that.

3            But my courtroom deputy needs copies of documents --

4      of exhibits.  And ultimately the jury is going to need copies

11:33  5      of exhibits, whether they're provided electronically or whether

6      they're provided in paper form.  And you know, at this point I

7      would say to the parties you can do either.  You know, we

8      can -- I think we can send a flash drive.  To the extent -- but

9      again, to the extent that you'd have to delete anything that

11:33 10      isn't -- you know, if you've loaded things on there and they're

11      not admitted, they'll have to be deleted, Mr. Lizana, before

12      they go back to the jury electronically, right?

13            MR. LIZANA:  Right, right.

14            So Your Honor, first of all, I know you've done a lot

11:34 15      of heavy lifting in helping us try to get this ready.

16            THE COURT:  Yeah.

17            MR. LIZANA:  And I recognize that, and the last thing

18      going on with both Edward and I, myself, trying to get this

19      together, and I think a lot of it has to do with some of the

11:34 20      delays of both our medical issues, things that normally would

21      have been done by now.

22            THE COURT:  Yeah, I think that's right.

23            MR. LIZANA:  We have the same issue.

24            THE COURT:  With Mr. Blake, yes.

11:34 25            MR. LIZANA:  Right.  And so when Ed and I exchanged

exhibits, I think -- I will let you speak for yourself, Ed --
but I would say that we're thinking we're going to get together
at some point and discuss them in more detail.

    MR. PIKULA:  I can get together this afternoon.

    MR. LIZANA:  That's what I was going to say.  Let's do
that.

    THE COURT:  That would be --

    MR. LIZANA:  Apparently we're right down the hall from
each other.

    MR. PIKULA:  We bumped into each other on the same
floor, our offices.

    THE COURT:  Listen, have a discussion as well about
whether it's possible to resolve some of these claims.  It's
worth talking about.  It's worth talking about.

    MR. LIZANA:  Okay.

    THE COURT:  I mean, you know, we tell you that if we
bring the jurors in and then we resolve it at the last -- I
mean, I'm going to go ahead and pick a jury on Monday, but if,
you know, if you tell me on Monday that you are talking and
that you think there is some light at the end of the tunnel, we
could start presenting evidence on Wednesday or something like
that.  But I would really need to know that you have made
really significant progress and that you're sort of in the
ballpark.

    Okay.  What I am going to try to do is get the parties

        1    a list of voir dire questions this afternoon based -- it will

        2    be based on the voir dire questions -- so it will be based on

        3    the voir dire questions that I, you know, regularly ask, which,

        4    again, I've said I have certain things I routinely ask like

11:36   5    this is the probable length of the trial and the probable

        6    schedule and, you know, do you have, you know, are there

        7    personal reasons why you can't sit, you provide care or, you

        8    know, would it be a financial hardship.  I think we

        9    sometimes -- I do think we do excuse jurors on that basis if

11:36  10    they're self-employed.  Even that may not be wholly fair, but I

       11    have generally done that.

       12             And I -- so I am -- you know, I'm going to try to

       13    carve this down into a list that -- because, again, my practice

       14    is not to ask a show of hands, Mr. Lizana, because I'm going to

11:36  15    have like -- I think it's more than 70 people sitting in here.

       16    I can't keep track.

       17             MR. LIZANA:  Right.

       18             THE COURT:  But to ask the parties to keep in mind

       19    what the question are.  And so I try to keep the questions to a

11:36  20    number that I think that they maybe can keep in mind, and then

       21    I bring them in and I say was there any question that we asked

       22    that caused you to think you would not be able to sit as a

       23    juror, so that we go to the question that stuck in their mind

       24    first.  If they don't remember, I go back over everything.

11:37  25    But, you know, that's -- you know, to try to keep things moving

         1    along, that has basically been how I do it.

         2         And so it means that I'm going to narrow down the

         3    lists that each of the parties has proposed, and again, when

         4    we're questioning people, I'm going to ask a juror to step

11:37    5    back, and say is there anything -- any follow-up question.  And

         6    so, you know, my sense is that you've given me a lot of

         7    questions, Mr. Lizana, that I think go to the -- you know, that

         8    you've framed because you're concerned about really -- really

         9    understanding whether there's a bias or a prejudice there that,

11:37   10    you know, so I'm going -- I'm hoping that if you hear

        11    something, you know, my list of questions are going to be more

        12    limited, but there would be an opportunity for you to say could

        13    you ask these two or three additional questions, and then we

        14    can deal with it that way.  Is that --

11:38   15         MR. LIZANA:  Yes, that's the spirit in which they were

        16    submitted.  I trust and I get from the sense of our last

        17    discussion that you're understanding the need to screen for

        18    biases --

        19         THE COURT:  Yeah.

11:38   20         MR. LIZANA:  -- and so I just wanted to have some --

        21         THE COURT:  Yes.  No, I understand, I understand.

        22    And, you know, you may be dissatisfied when I carve this

        23    list -- you may not be satisfied when I carve this list down,

        24    and I will preserve any objection you have to it.  But that's

11:38   25    why I'm doing what I'm doing.

|       | 1  | MR. LIZANA:  Right, right. |

         1    MR. LIZANA:  Right, right.

         2    THE COURT:  Just because, as a practical matter, I

         3    think the jury -- I understand -- you know, what I tell the

         4    jurors up front is the only reason we ask you these questions

11:38    5    is our goal is to get a fair and unbiased jury.  And you know,

         6    we're not judging anybody.  It's not -- that's not the point.

         7    The point is just we need to give the parties a fair shake here

         8    and --

         9    MR. LIZANA:  Okay.  Right.

11:38   10    THE COURT:  And we need you to be -- so we need you to

        11    be forthcoming, you know, so anyway.

        12    MR. LIZANA:  Your Honor, one thing I did not

        13    appreciate, and I didn't know you didn't have an opportunity to

        14    look at the images.

11:39   15    THE COURT:  The Facebook posts?

        16    MR. LIZANA:  Yes, yes.  And some of them --

        17    THE COURT:  I don't think they've ever been submitted.

        18    MR. LIZANA:  They were part of exhibits way in.

        19    THE COURT:  Well --

11:39   20    MR. LIZANA:  And I think you might have, you maybe

        21    have just forgotten.

        22    THE COURT:  No, I would have remembered.  I have never

        23    looked at them.

        24    MR. LIZANA:  I remember you saying at one point that

11:39   25    those images were disturbing.  So I assumed that you looked at

1    them.

2             THE COURT:  No.  I think what I was reflecting on

3    is that -- I think what I questioned Mr. Pikula on was he

4    characterized them as images that any sort of -- I'm putting

11:39  5    words in his mouth -- but in essence, right-thinking person

6    would find offensive, and that's really what I was referring

7    to --

8             MR. LIZANA:  Oh, okay.

9             THE COURT:  -- was his characterization that any

11:39 10    right-thinking person --

11             MR. LIZANA:  Right, right.

12             THE COURT:  Excuse me.  That, you know, there were

13    many things in the posts that any right-thinking person would

14    agree are offensive and so --

11:40 15             MR. LIZANA:  Right, right.  So there are at least two

16    of the images that some of our voir dire questions were drawn

17    from --

18             THE COURT:  Okay.

19             MR. LIZANA:  -- where the authors of the posts were

11:40 20    taking issue with the Black Lives Matter movement.

21             THE COURT:  Yeah.

22             MR. LIZANA:  And making fun of the black lives

23    splatter when a truck hits a black protestor, that kind of

24    thing, right?

11:40 25             THE COURT:  I think that's a fair -- if you're asking

1    will I ask a question about Black Lives Matter?

2         MR. LIZANA:  Yes.

3         THE COURT:  I think in some way, shape, or form I

4    think that's probably appropriate here, and given the date and

11:40  5    time, so, yeah, if that's what you are asking me to think about

6    this afternoon, I will think about that, and I will include

7    some question that directly addresses Black Lives Matter.  And

8    I know you also asked whether -- one of your proposed questions

9    was whether, you know, anybody had sort of participated in "All

11:40  10   Lives Matter," which I don't -- is that --

11        MR. LIZANA:  I think it's not damning in and of

12   itself.

13        THE COURT:  Okay.  All right.  I think I'm going to

14   focus on Black Lives Matter.  Oh, well, it's really the jurors'

11:41  15   sentiments regarding --

16        MR. LIZANA:  Right.

17        THE COURT:  -- Black Lives Matter or All Lives Matter

18   because both of those are supportive of -- okay.  Black Lives

19   Matter or All Lives Matter, yes, okay.  Would there be any

11:41  20   objection to a voir dire question that's focused that way,

21   Mr. Pikula?

22        MR. PIKULA:  No.

23        THE COURT:  No, I think that's appropriate.  Okay.

24   Well, I think we all have our work cut out for us.  I'm going

11:41  25   to let you go so you can do some of it.

1          MR. LIZANA:  Yes.  I see some --

2          THE COURT:  So let's just -- so I think what happens

3     is we bring our jurors in.  They come in like pretty early on

4     Monday, but then they're shown a film about jury duty.  They

11:41  5     don't actually get up to the courtroom until somewhere closer

6     to maybe 9:30 or thereabouts.  And then one other thing I need

7     from the parties for purposes of voir dire, meaning I need it,

8     because it's for picking the jury, is and -- is I need a brief

9     nonargumentative description of the claims, and it can be the

11:42 10     plaintiffs say, you know, the plaintiffs are claiming A, B, C,

11     and D, the City denies liability.  But I need a brief, very

12     brief description this is what the case is about, some very

13     brief context for the jury, and that goes right up front when I

14     start questioning -- before I even start voir diring the

11:42 15     jury -- the jurors, so -- and I don't have that.

16          And again, I don't have a list of -- I don't really

17     have a list of witnesses that makes me feel comfortable -- with

18     which I am comfortable.

19          MR. PIKULA:  I think the ball is in your court.

11:43 20          MR. LIZANA:  Well, actually, Mr. Pikula and I have

21     been working on it.

22          THE COURT:  Oh, good.  I mean three sentences at most.

23          MR. LIZANA:  I think that last time I sent you one.  I

24     don't know if we ever got to review it together.

11:43 25          MR. PIKULA:  All right.  We'll do that.

1          MR. LIZANA:  We'll do that today.  With witnesses

2     concise statement.

3          THE COURT:  Yeah.  Okay.  All right, Counsel.  Get to

4     work.  Thank you.  Have lunch.  Get to work.

11:43  5          MR. PIKULA:  And I will find out who's going to be

6     Monday?

7          MR. LIZANA:  Yes, we can talk about that, too.

8          MR. PIKULA:  Okay.

9          THE COURT:  Okay.  I don't know -- again, I'm not sure

11:43 10     you're going to get to witnesses on Monday.  Openings, you

11     know, openings, maybe.

12          MR. LIZANA:  That's what I kind of assumed, get to

13     openings and start witnesses the next day.

14          THE COURT:  Probably, probably.  But again, I'm going

11:43 15     to, you know, given that we're using jurors' time, I'm going

16     to, you know, try to use the time that I know, you know, that I

17     know we have so that we can move the case along.

18          And you know, just to I guess warn you -- I guess,

19     Mr. Lizana, I'm not really phrasing this as a warning, but just

11:44 20     to sort of put it out there, I'm going to look at what we have

21     from Dr. Erath we had before and what this new report is and

22     just to see how different it seems to me.  And if it seems

23     really significantly different to me, I will ask the parties to

24     brief whether it's admissible testimony when -- if there are

11:44 25     significant differences really on the eve of trial because I

1    think it's very fair to call June 6th the eve of trial in this

2    case.  Okay?

3              MR. LIZANA:  Thank you.

4              MS. DESOUSA:  Thank you, Your Honor.

11:44    5              (Recording ends at 12:31:23)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the audio-recorded proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 5th day of November, 2024.

10

11

12

13                    /s/ Linda Walsh

14                    Linda Walsh, RPR, CRR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25